In re Laura Susan REYNOLDS, Debtor.

Laura Susan Reynolds, Plaintiff,

v.

Pennsylvania Higher Education Assistance Agency, United States Department of Education, Claremont McKenna College, Sallie Mae Servicing Corp., Risk Management Alternatives, Inc., the University of Michigan, Great Lakes Higher Education Corp., Hemar Insurance Corp. of America, OSI Collection Services, Inc., NCO Financial Systems, Inc., Windham Professionals, Van Ru Credit Corp., Student Loan Servicing Center, National Enterprise Systems, Educational Credit Management Corporation, Eduserv Technologies, Inc., and the Education Resource Institute, Defendants.

Bankruptcy No. 00–32707.
Adversary No. 01–3079.

United States Bankruptcy Court, D. Minnesota.

Jan. 2, 2004.

Jonathan A. Strauss, Monica L. Clark, Dorsey & Whitney, LLP, Minneapolis,

MN, Jennifer M. Wangerien, for Laura Susan Reynolds.

Philip R. Schenkenberg, St. Paul, MN, for PHEAA, Hemar Insurance Corp. of America, The Education Resources Institute.

Roylene Ann Champeaux, Minneapolis, MN, for U.S. Department of Education.

Erin W. Sheehan, General Counsel Windham Prof., Salem, NH, for Windham Professionals Inc.

Curtis P. Zaun, St. Paul, MN, for Educational Credit Management Corp.

## MEMORANDUM DECISION

### GREGORY F. KISHEL, Chief Judge.

This adversary proceeding for determination of dischargeability of debt under 11 U.S.C. § 523(a)(8) came on before the Court for trial. The Plaintiff ("the Debtor") appeared by her attorneys, Jonathan A. Strauss, Monica L. Clark, and Jennifer M. Wangerien. Defendants The Education Resource Institute ("TERI"), Pennsylvania Higher Education Assistance Agency ("PHEAA"), and HEMAR Insurance Corporation of America ("HEMAR") appeared by their attorney, Philip R. Schenkenberg. The United States Department of Education appeared by Roylene A. Champeaux, Assistant United States Attorney. Educational Credit Management Corporation ("ECMC") appeared by its attorney, Curtis P. Zaun. Upon the evidence received at trial and the arguments and memoranda of counsel, the Court memorializes the following decision.

### PARTIES

The Debtor filed a voluntary petition under Chapter 7 on June 20, 2000. To finance her education at the University of Michigan Law School, the Debtor had taken out loans under various programs, in-cluding several guaranteed by the United States through its Department of Education. The loans are evidenced by eleven different promissory notes. The Debtor has not taken any action to consolidate these loans under any public or private program.

As a result of loan origination, or assignment subsequent to origination, the Defendants that participated at trial presently hold the rights to payment under all of these promissory notes.

### GOVERNING LAW

This adversary proceeding sounds under 11 U.S.C. § 523(a)(8). That statute creates an exception from discharge in bankruptcy "for an educational ... loan made, insured or guaranteed by a governmental unit ..." This exception from discharge is self-executing; it does not require a court adjudication to make it effective. H.R. REP. No. 595, 95th Cong. 1st Sess. 79 (1977), U.S.Code Cong. & Admin.News 1978, p. 5963. The Debtor, however, maintains that allowing this exception to lie would "impose an undue hardship on" her and her dependants, within the meaning of the later text of § 523(a)(8). Thus, she seeks a determination that all of her educational loan debts were dischargeable, and were in fact discharged, in her bankruptcy case. As the proponent of an exception to the exception from discharge, the Debtor has the burden to prove her entitlement to it. *In re Ford,* 269 B.R. 673, 675 (8th Cir. BAP 2001); *In re Svoboda,* 264 B.R. 190, 194 (8th Cir. BAP 2001); In *re McCormick,* 259 B.R. 907, 909 (8th Cir. BAP 2001); *In re Cline,* 248 B.R. 347, 351 (8th Cir. BAP 2000).

A determination of undue hardship under § 523(a)(8) is an issue of law. *In re Long,* 322 F.3d 549, 553 (8th Cir. 2003). In this Circuit, this issue requires an examination of the facts and circum-

stances that bear on the debtor's ability to make payment on account of the educational loans in question, and that otherwise go to the issue of hardship. *In re Long,* 322 F.3d at 553; *In re Andrews,* 661 F.2d 702, 704 (8th Cir.1981). The factors relevant to this inquiry include:

> 1. the debtor's past and present financial resources, and those the debtor can reasonably rely on for the future;
> 2. the reasonable necessary living expenses of the debtor and the debtor's dependents; and
> 3. "any other relevant facts and circumstances surrounding each particular bankruptcy case."

*In re Long,* 322 F.3d at 554; *In re Andrews,* 661 F.2d at 704. *See also In re Andresen,* 232 B.R. 127, 132 (8th Cir. BAP 1999) (cited with approval on this point in *Long,* 322 F.3d at 554). Where a debtor will have sufficient funds from income or other sources to cover ongoing payment on educational loans, while maintaining a "minimal standard of living," the debtor has not proven undue hardship, "the debt should not be discharged." *In re Long,* 322 F.3d at 554–555.

## FINDINGS OF FACT

### *The Debtor's Age and Family Status.*

The Debtor is presently thirty-two years old. On July 3, 1999, she married John Turner. The Debtor has no children, by this marriage or otherwise. Her husband has three children by another relationship. All of his children are in their mid-teens in age. He pays child support for them via wage withholding. The Debtor and her husband reside in St. Paul, Minnesota, in a one-bedroom rented apartment.

### *The Debtor's Education, Professional Status, Employment Search, Employment History, and Household Income.*

The Debtor is a graduate of Claremont McKenna College, Los Angeles County, California (B.A., *cum laude,* 1992) and the University of Michigan Law School (J.D., 1995). Her academic ranking in law school was "around the middle of the class." After graduating from law school, the Debtor took the Colorado bar exam. She passed it on her first attempt. She was admitted to the Colorado Bar in the fall of 1995. Her Colorado licensure is presently on an inactive status. She has not taken the bar exam, or sought admission to the bar by any other means, in any other state. She is not licensed to practice law in the State of Minnesota.

While she was in law school, the Debtor hoped to become a public defender after graduation, or to practice in some part of the juvenile justice/child protection system. During a job search in her third year in law school, she participated in an on-campus interview process. She sent out more than 400 resumes to law firms and other employers in Colorado, Minnesota, and Massachusetts. She also tried to make use of alumni ties. During her job search, however, she was granted only four interviews. She received no job offers.

During law school, the Debtor clerked for a county attorney's office, doing legal research and writing memoranda for attorneys on staff. Her only experience in the hands-on practice of law consisted of "about two hours" of services performed on a contract basis through a friend of her father, negotiating with vendors and drafting a contract. She did this work in the fall of 1995.

For about a year after graduating from law school, the Debtor continued to seek employment as an attorney by sending letters and resumes to prospective employers. When her efforts in Colorado were not productive, the Debtor moved to Bos-

ton, Massachusetts, because friends of hers lived there. She tried to use University of Michigan alumni contacts in Boston, as well as friends from law school who had obtained jobs in law firms. She did not receive any job offers there.

Sometime in 1996, the Debtor stopped sending out written applications and making inquiries about employment as a practicing attorney. She had a "head hunter" employment consultant review her credentials and effort. After doing so, that person "couldn't figure out what [she] was doing wrong."

After the Debtor was unable to obtain employment as an attorney in Boston, she began to take clerical positions through temporary-employment agencies. She worked as a secretary or an assistant in the Space Management Department of Boston University, in the Executive Search Department of Fleet Bank, and in the sales and catering department of a local Holiday Inn for several months each. She was paid between $10.00 and $12.00 per hour on each of these jobs.

In August, 1997, the Debtor moved to the Twin Cities of Minnesota, again because she had friends living there. By then, the Debtor had "given up hope of working as an attorney." She again "started temping" as a secretary, at compensation of $12.00 per hour.

In October, 1999, the Debtor took a permanent position as an administrative assistant in the Communications Department of the St. Paul Foundation. Her starting annual salary was $29,000.00; it increased to $30,000.00 during the course of her employment there. In this capacity, she worked on various reports and publications. The Debtor kept this employment until the spring of 2001, receiving positive and very positive periodic evaluations.

She voluntarily left the St. Paul Foundation in the spring of 2001, without another employment offer or strong prospect. While working temporary clerical assignments for the next six to seven months, the Debtor applied without success for a position as a headnoter for West Group, the large legal publisher, and a clerical position in the communications office of the Minnesota Court of Appeals.

In November, 2001, the Debtor took the employment that she held as of the date of trial, as a secretary-receptionist with a local building contractor, Roof Spec Inc. She is compensated at the rate of about $15.00 per hour, or approximately $30,000.00 on an annualized basis; she testified to receiving approximately $1,700.00 in net earnings per month. She receives health insurance through her employment, paying a premium of $130.00 per paycheck. The Debtor stated that she had received some "negative feedback" on her performance, centering around her attitude and her speed in performing her duties, but she had retained this employment.

The Debtor's husband John Turner is employed by First Student Transportation as a school bus driver on a standby basis. He works between 15 and 30 hours per week on this job, is compensated at an hourly rate of $13.75, and is paid weekly. Turner had had a second job as a driver or delivery person for an entity called Laboratory Testing, working "three-quarter time" or (presumably) about 30 hours per week, but he had lost this employment shortly before trial. As of the date of trial, he was looking for another part-time job in driving or delivery, and expected to get one at a comparable rate of compensation. During calendar year 2001, First Student Transportation paid Turner gross compensation of $29,000.00, disbursed during the

nine months of the school year.[1]

Turner's net monthly income as of the date of trial, working around 32 hours per week, was approximately $1,300.00, after the withholding of his current child support obligation.[2] It was reasonably clear that this reflected a temporary reduction of income for him, and that it was within his power to reverse it by replacing the lost part-time driver job or by increasing his hours with First Student. Adjusted proportionately for a replacement of that income, the monthly net income to be deemed to him would total approximately $1,600.00.

On an annualized basis, with Turner employed so as to receive gross income of approximately $29,000.00 per year and the Debtor having her full-time employment with Roof Spec Inc., their total net household income is approximately $3,300.00 per month.

### The Debtor's Medical and Psychological Condition.

The Debtor has received diagnoses of major depression, panic and anxiety disorder, borderline personality disorder, or all three, from a half-dozen different mental health professionals.

Her affliction with these mental illnesses is long-standing. While in junior high school, she experienced symptoms of suicidal ideation and fatigue, feelings of sadness, hopelessness and personal isolation, and "unexplained" physical ailments for a year. These symptoms recurred three times while she was in high school. She received no psychiatric or psychological care for these episodes.

During her junior year in college, the Debtor had a "very bad panic episode" while traveling in Scotland during a "semester abroad" educational program. She was unable to cope with strong feelings of disorientation, was convinced that she could not communicate with or understand the local people, and was unable to manage her personal finances. Her parents quickly arranged for her return to the United States. She then consulted a psychiatrist for the first time, receiving a diagnosis of agoraphobia and depression, and went through counseling therapy. She missed a semester of college, making up the credits by summer course work. Upon returning to campus, she began experiencing symptoms of depression (suicidal thoughts, feelings of sadness and isolation) after the breakup of a relationship with a boyfriend. During classes, "three to four times a day," she had panic attacks (feelings of pressure and tightness in her chest, a sense of her emotions being out of control, "a roller coaster feeling").

---

1. If Turner's contemporaneous hourly rate of pay was $13.75, this would mean that he had worked a bit over 40 hours per week for the full 52 weeks of the year. He had testified both to not working for First Student Transportation during the summer months, and to taking substantial overtime when it was offered. Regardless of how these impacted on the circumstances of his actual work attendance, it is clear that First Student Transportation had reduced his hours to some degree between sometime in 2001 and the date of trial; the most recent weekly paycheck stub in evidence showed 33 hours worked that week.

2. This was calculated by taking the $302.71 in weekly net earnings evidenced by the paycheck stub in evidence and applying a multiplier of 4.3. Though the Debtor and her counsel evidenced some confusion as to whether this was net of child support payments, the stub includes line-entries for two different withholdings for family support obligations. On a mensualized basis, the amount is consistent with other evidence going to Turner's obligation.

During the second semester of the Debtor's first year in law school, "the truly bad depression started," with intense and morbid feelings of hopelessness "with [her] all the time." She frequently considered suicide, "pray[ing] to God for death." She also engaged in several forms of physically reckless behavior, including intentionally driving in a dangerous manner.

The Debtor did not seek medical or psychological treatment while in law school. After graduating and moving to Colorado, she treated with the psychiatrist who had given her the original diagnosis of agoraphobia and depression. She consulted and treated with various mental health professionals in Boston and then in Minneapolis/ St. Paul.[3] In Minnesota, she "saw" a medication manager and a therapist-social worker through the Ramsey County Social Services Department. After she received health insurance coverage as a benefit of employment, she started seeing a psychotherapist regularly.

Over the years, these medical professionals have prescribed a variety of anti-depressants, mood-stabilizing, and anti-psychotic medications for the Debtor. The drugs have included Zoloft, Ziprexa, Rispridol, and Serachrome. She is currently prescribed Tobimax for mood stabilization—to remedy panic attacks—and Effexor as an anti-depressant. For most of these medications, the Debtor either experienced unpleasant physical side effects, or required greatly increased dosages over time to achieve the same effect. She has had to take increasing dosages of her current medications since she started using them. The side-effects from her current medications include numbness in the extremities, drowsiness, distraction, and "unexplained itching." She also suffers from irritable bowel syndrome. The Debt-

or testified that Tobimax had "significantly reduced" the incidence of her panic attacks, and that she had not had an episode identifiable to agoraphobia since the original one in 1991. She also stated somewhat broadly that her "depression [was] getting worse now, as we go along."

Despite her regimen of therapy and medication over the several years preceding trial, the Debtor still experiences many of the symptoms of depression: feelings of hopelessness and resignation; lethargy to the point of sleeping up to sixteen hours per day; suicidal and self-destructive Ideation; occasional mild self-injury (cutting herself) "to relieve tension"; and neglect of personal hygiene, appearance and household responsibilities. She states that her personal financial situation, particularly her large educational loan burden, is a "major stressor."

At present, the Debtor is most properly diagnosed as suffering from a major depressive illness, manifested by episodes of moderately severe depression. This is categorized as a disthymic disorder—that is, a persistent, consistent, chronic and long-standing condition. She also has comorbidity, in the form of accompanying anxiety and panic disorders, clearly triggered by stressful incidents or conditions that she perceives as stressful. Her current mix of medications can reduce her symptoms, but it does not do so consistently. This is a common characteristic of comorbidity. Increases in dosage have had some positive effect for the Debtor, but this appears to have leveled off for all medications thus far and her response to the maximum dosage "tends to wane." Ultimately, as her psychiatric expert witness reported, "[n]o medication combination has resulted in a substantial sustained partial

---

**3.** It is not clear from the record, but it appears that the frequency and extent of this involvement depended upon the availability of insurance coverage for its cost.

remission" of the symptoms of her mental illness.

## The Effect of the Debtor's Psychological Condition on her Employability.

The effects of the Debtor's mental illness on her function in life are fairly characterized as tragic. On the one hand, she clearly is a person of substantial natural intelligence. This is recognized as such by the mental health professionals who have treated or evaluated her, and is evidenced by her achievement in the controlled environment of academia. On the other hand, in a non-academic environment her conditions of depression and anxiety work, synergistically or individually, to deprive her of the ability to analyze problems and to make decisions and judgments for the benefit of third parties with the certainty and confidence that are required of an attorney and fiduciary. She is unable to consistently focus on more complex problems over an extended period of time.

As both the Debtor and her expert witness noted, her initial inability to pursue her chosen profession sapped her confidence, which then became a self-fulfilling prophecy. Lack of belief in herself holds her back from taking the sort of calculated risks that workplace advancement requires, and thus deprives her of the chance to prove herself. She is excessively critical of herself, and chronically irritable as a side-effect of her medications; she clearly perceives others' criticism of her as personal insult or attack. These traits and tendencies are consistent with her diagnoses of borderline personality disorder and depression. This emotional vulnerability, persisting and resistant to treatment, is a huge impediment to effective participation in the rough-and-tumble of the practice of law; there, personal ambition and aggression are overt and ubiquitous, reined in only by an attorney's voluntary compliance with complex and abstract principles of ethics and professionalism. In a more generalized way, the Debtor's tendency to overreact to stresses in the workplace is an equal impediment.

Beyond these functionally-related considerations, there is very little chance that the Debtor would be able to obtain admission to the Minnesota Bar, because it is quite unlikely that she would satisfy the Board of Law Examiners as to her fitness to practice.[4] With her long-term history of mental illness, the Debtor would have to demonstrate that she had been asymptomatic of depression and anxiety for an extended period. Given the undisputed medical evidence in the record, there is simply no prospect that the Debtor could do this within the foreseeable future.[5]

---

4. Under Rule 5 of the Minnesota Rules for Admission to the Bar, an applicant must satisfy the Board as to "character and fitness" to practice law, including the possession of such "essential" abilities as the ones "to reason, recall complex factual information and integrate that information with complex legal theories," to "communicate...with a high degree of organization and clarity," "to act diligently and reliably in fulfilling one's obligations," and "to comply with deadlines and time constraints..." No party to this proceeding made the Debtor's "character" an issue, in the sense of her honesty or personal integrity. However, it is undisputed that the Board is quite concerned about applicants' psychological fitness to handle the great stresses and emotional uncertainties of practice in a client-centered environment.

5. To make out her case that she could not get the licensure necessary to practice law in Minnesota, the Debtor presented the testimony of Edward F. Kautzer, Esq. Kautzer qualified himself as an expert on the issue through his extensive practice in the defense of disciplinary complaints before the Minnesota Board of Lawyers' Professional Responsibility, and in representing applicants for admission to the Minnesota bar before the Board of Law Examiners after they had been questioned or refused on character-and-fitness

### The Debtor's Vocational Profile and Employment Prospects.

Given the severity and persistence of her mental illness, and the unlikelihood of her gaining a license, the Debtor is simply unable to be employed as a practicing attorney. She has recognized this herself, having concluded that she could not undertake the practice of law and maintain her ethical obligation to practice competently. Her treating psychotherapist agreed with this decision, and endorsed the Debtor's analysis of her own limitations. There is no indication in the record that she will ever gain enough psychological strength and equilibrium to enter the practice of law and continue in it.

The circumstances that prevent the Debtor from working as an attorney would also prevent her from working as a paralegal under the supervision of an attorney. The duties of that position are virtually as client-centered as those of a practicing attorney, and its demands and stresses are virtually indistinguishable in nature. The Debtor and the clients of her employer would be exposed to the same grave risks were she to work in a paraprofessional status. Finally, there is no realistic chance that the Debtor could obtain employment as a legal secretary, or that she could maintain an effective performance as one. During her job search she had explored this option to some extent, but she gave up after the prospective employers repeatedly expressed unwillingness to consider a law school graduate for a clerical position.[6]

As a vocational matter, the Debtor simply cannot be employed in an administrative or clerical capacity at any level of responsibility greater than that of office manager or administrative assistant. Those positions would be an advancement from the position that she currently holds, and one unlikely in the near future given the involuntary and semi-involuntary limitations on her abilities to assume more responsibility over third parties. As a practical matter, for the indefinite future, she will remain at the level of employment, responsibility, and compensation that she has had since she took her first "permanent" position with the St. Paul Foundation. In addition, the manifestations of her persisting mental illnesses may make it difficult for her to retain any particular job for an extended period of time. A recurrence of severe depression or a lapse into the behavioral incidents of borderline personality disorder would likely impair her performance, so as to lead to voluntary or involuntary termination.[7]

grounds. He very credibly opined that it would be "highly unlikely" that the Debtor would be admitted to the Minnesota bar at present, and that she would have to show a very long-term remission of her mental illness before she could be. Among other things, he stated that in terms of result the psychologically-related fitness considerations would be applied more stringently to an applicant for admission who showed the Debtor's profile than they would be to a Minnesota-licensed attorney who had developed it but was evidencing success in coping with it. The distinction, he noted, was between the privilege of being admitted and the vested right of being licensed already. None of the Defendants produced expert testimony to rebut Kautzer's, and their counsel's cross-examination did not materially impair its probity or weight.

6. The Debtor surmised that they were concerned that a secretary with training equivalent to a lawyer's would inevitably second-guess the work results of the attorneys with whom the secretary worked, or otherwise interfere in the attorneys' performance of professional functions. This conclusion as to the existence and nature of prospective employers' concerns is not unreasonable, whatever merit the employers' concerns would have in actuality.

7. The findings on these fact issues are both direct and by way of inference, as are the observations in the "Discussion" section of

### The Debtor's Household Living Expenses.

With seasonally-varying categories of expense averaged over a full year, the Debtor estimated her current monthly household expenditures as follows:

| | |
|---|---|
| Rent | $ 750.00 |
| Utilities | |
| Electricity | $ 40.00 |
| Telephone | $ 120.00 |
| Clothing | $ 100.00 |
| Food | $ 450.00 |
| Transportation | |
| Car Payment | $ 175.00 |
| Gasoline and Auto Maintenance and Repair | $ 280.00 |
| Automobile Insurance | $ 130.00 |
| Household and Personal | |
| Prescription Medications and Therapy | $ 130.00 |
| Non-prescription Medications | $ 47.50 |
| Personal Hygiene | $ 50.00 |
| Recreation | $ 40.00 |
| Laundry | $ 20.00 |
| Newspapers | $ 15.00 |
| Past-due Income Taxes | $ 50.00 |
| **TOTAL:** | **$2,397.50** |

■ The Debtor and her husband maintain two forms of telephone service, a "land line" at home and cellular-phone service. Under the terms of his custody and visitation arrangement, her husband is required to be accessible via cell phone at all times.[8] Under the circumstances, their expenditure for telephone service is not unreasonable.

this decision. They are made on a thorough review of expert testimony presented by both sides. Both witnesses were practitioners and academics in the field of clinical psychiatry; both qualified as experts on the effects of mental illness on the performance of job-related tasks in the setting of professional and business offices. The Debtor presented the "live" testimony of Robert B. Jones, M.D. The issue posed to Dr. Jones was on-point to this proceeding: whether a person of the Debtor's current psychological profile and psychiatric diagnosis could successfully perform as a practicing attorney, a paralegal, or a legal secretary or other office support person in a client-centered practice of law, in a way to both meet client needs and promote her own mental health. He gave lengthy, detailed, precise, and comprehensible testimony on the nature and effects of the mental illnesses he diagnosed in the Debtor, and the ways in which they manifested in her. He demonstrated an understanding of the psychological demands of serving legal clients. His opinion was that the Debtor simply could not be expected to undergo the frequent stresses experienced by legal professionals who are in "a privileged relationship with a client," without very soon jeopardizing the equilibrium of her own mental health. The only responsible inference is that this could immediately jeopardize the innocent client. Dr. Jones's diagnosis and opinion were well-supported; they were spontaneously delivered, and resistant to challenge on cross-examination. They certainly preponderated over those given by the Defendants' expert, Thomas G. Gratzer, M.D. Dr. Gratzer's testimony was submitted via videotaped deposition and written transcript. His diagnosis was similar to Dr. Jones's in its overall points; it differed largely in emphasis, by attaching primary significance to a "personality disorder with borderline features" rather than depression, and by describing her "major depressive disorder" as being in "near full remission." Ultimately, however, the issue put to him was not the one at bar. He spoke to whether the Debtor's mental illness rendered her "disabled," in the sense of not being able to work at all and seemingly in the legal sense applicable to the Social Security Disability program or to a claim under a private policy of disability insurance. He opined that the Debtor was not "disabled," but that was not really the point. The Debtor has never gainsaid that she can work at some sorts of jobs, and she has done so. Beyond that, his statement that there was "no reason why she should avoid any particular job" was curt, conclusory, and unelaborated. In light of the undeniable limitations attendant to the Debtor's diagnosed conditions and actively and currently manifested by her, this was simplistic and inaccurate. On balance between the two, Dr. Jones's observations and opinion were by far the more credible. They fully supported the findings made here.

8. The reason for this requirement is obscure, but there is no evidence to challenge its existence.

■ The other budget entries described by the Debtor were entirely reasonable in nature and amount, for a household of the composition of hers, located in the Twin Cities metropolitan area. However, she did not include any allowance for unanticipated or emergency expenses that would be reasonably incurred. Examples might include larger medical expenses not covered by insurance due to deductibles, co-pays, or limitations on coverage; major automobile repairs that her husband could not handle; or unusual expenses from her husband's visitation with his children. Given the variations of human experience over the longer term, it is not inappropriate to make allowance for a cushion for such "emergency" or "contingency" expenses—particularly for households of low or moderate income that are unlikely to be able to save money regularly. This must be done for the Debtor's case, given the limitations that most medical insurance plans put on coverage for psychiatric therapy. Various aspects of the Debtor's medical condition, personal makeup, and financial situation are so prone to generate such expenses, that a line-entry of $100.00 per month for such a "cushion" is entirely justified.

■ Finally, there is the matter of transportation. The Debtor and her husband clearly require two automobiles; their places of employment are separated and the public transportation system in the Twin Cities does not provide regular or frequent service to most of its extended metropolitan area. Obviously, they have made do with used cars of aged vintage, held together by her husband's maintenance.[9] Presently, they have the advantage of a low debt service obligation for the acquisition of the decade-old vehicles

they drive, through the accommodation of a personal loan from the Debtor's brother. It is fatuous to think that they will always have that boon. Given the likelihood that they will have to replace old cars on a relatively frequent basis, it is more realistic to attribute a fairly constant future expense for vehicle acquisition of $250.00 per month—$75.00 more than their current obligation. As older automobiles do, the current ones have required some significant repairs since acquisition; that expense is incorporated into the Debtor's line-entry for automobile "maintenance and repair," and the amount is reasonably related to the age of the vehicles and her actual experience.

With the total augmentation of $175.00 for these two items, the Debtor's household expenses, current and reasonably to be expected, total $2,572.50. One can defensibly round this up to $2,600.00, again to account for the vagaries of everyday life.

These exercises enable the bottom line: offsetting $2,600.00 in household expenses—a figure that is a bit more generous than the one the Debtor allowed herself—against the $3,300.00 of household income received in-hand, requires the deeming of an income surplus of $700.00.

### The Debtor's Assets and Other Financial Resources.

The Debtor and her husband own two aged motor vehicles, just discussed: a 1992 Mercury Sable, with 80,000 miles, used by her, and a 1990 Dodge Silhouette, with 130,000 miles, used by him. As would be expected, the cash value of these vehicles is nominal.

Other than the vehicles, the Debtor and her husband own a modicum of personalty:

---

9. Turner refurbished both on purchase, and does the regular maintenance; he brings ma-

jor repair work to professionals.

the standard array of lower-value household goods and furniture; a modest wedding ring set; and two shares of stock in the Wal–Mart Corporation, owned by her husband. They have no other investments, retirement funds of any sort, or liquid assets other than their operating bank accounts. As of the date of trial, the Debtor had a balance in her checking account of about $700.00, a typical amount for her after the deposit of one paycheck but before the payment of any major household bills. The Debtor was unaware of the balance in her husband's checking account, but the record supports the inference that it was certainly no larger than that in hers, and regularly drawn down like hers.

### The Debtor's Educational Loan Debt Structure.

The Debtor's debt to the five Defendants participating at trial is evidenced by a series of 14 promissory notes, executed between July 14, 1992 and September 20, 1994.[10] As of mid-March, 2002, the Debtor's total outstanding educational loan indebtedness exceeded $142,044.55. Were each debt to each participating Defendant, in the amount outstanding as of mid-March, 2002, to be repaid by the Debtor at then-current interest rates over the respective terms of 10 and 20 years, the Debtor's monthly payment obligations would be as follows:

| Noteholder | Over 10 Years | Over 20 Years |
|---|---|---|
| TERI | $ 605.00 | $ 338.00 |
| HEMAR | $ 110.50 | $ 70.06 |
| PHEAA | $ 463.09 | $ 307.03 |
| US DOE | $ 343.43 | $ 227.72 [11] |
| ECMC | $ 119.02 | $ 78.74 |
| TOTALS: | $1,641.04 | $1,021.55 |

10. The parties stipulated in writing to the dates of each such note, the identities of the first obligee and subsequent assignee(s), the amount of the loan recited on each note, the amount of the balance of principal and interest outstanding on each as of stated dates in 2002, and an ongoing interest accrual. These stipulated facts are incorporated by reference

The Debtor's obligations to PHEAA, ECMC, and U.S. DOE are eligible for consolidation under the William D. Ford Direct Loan Program. The balances on these obligations totaled $87,523.39 as of mid-March, 2002. If one assumed that consolidated debt amount; an interest rate of 6.75%; an adjusted household gross income of $51,924.79 for the Debtor; and a family size of three, for such a consolidation, the Debtor's initial monthly payment obligations under the Ford Program's four options would be as follows:

| | |
|---|---|
| Standard (10–year repayment period) | $1,004.98 |
| Extended (30–year repayment period) | $ 567.68 |
| Graduated (30–year repayment period) | $ 502.49 |
| Income–Contingent (until later of payment in full or 25 years) | $ 621.58 |

### Payment History on the Debtor's Educational Loans.

The first payments on the Debtor's educational loans became due while she was in Boston. She made these payments for about six months, from her meager earnings at the time. She found that she was indirectly funding the payments by using credit card accounts, charging current living expenses to free up cash to pay on the loans. She could not sustain this, and defaulted on the loans.

This led to dunning calls and other collection activity against her. The educational lenders' collection agents refused her requests to renegotiate the payment terms to amounts more within her immediate means. After the Debtor moved to Minnesota in 1997 and found employment prospects no more lucrative there, she de-

into this decision; it is not necessary to formally reprise the data.

11. This assumes an even amortization. If repayment were on a graduated schedule under U.S. DOE's program, the payment amount would start at $171.72 and go up to $340.53.

cided she had no hope of repaying the loans.

## DISCUSSION

Under the statute, the issue is whether these facts and circumstances would impose an "undue hardship" on the Debtor and her dependents, were any or all of her educational loan obligations excepted from discharge in bankruptcy. As noted earlier, this is a question of law. *In re Long*, 322 F.3d at 553.

■■■ Passing on questions of law requires the drawing of a line, the application of a standard enunciated in the law to a particular set of facts. Here the line is marked by the statutory modifier "undue."[12] The Eighth Circuit clearly expects the "undue" criterion to resonate with financial circumstances—specifically, the residual ability to make payment from current income once a baseline of reasonable but frugal household expenditure is established. *In re Long*, 322 F.3d at 554–555; *In re Andrews*, 661 F.2d at 703; *In re Andresen*, 232 B.R. at 140. However, the *Andrews/Long* formulation includes a catch-all for all other relevant facts—and those opinions' language does not limit them to financially-based ones. In *Andrews*, the Eighth Circuit recognized that a debtor's illness or disability was a relevant factor, particularly as it affected "ability to work" and the anticipated cost of medical care but not exclusively for those reasons. 661 F.2d at 704–05. *See also In re Strand*, 298 B.R. 367, 374–376 (Bankr.D.Minn.2003); *In re Korhonen*, 296 B.R. 492, 496 (Bankr.D.Minn.2003). Though the choice and weighting of such non-pecuniary factors are ultimately subject to *de novo* review by an appellate forum, *Long*, 322 F.3d at 553, the trial court clearly may take them into consideration. Otherwise, the Eighth Circuit's repeated references to a broad "totality-of-the-circumstances approach to the 'undue hardship' inquiry," *In re Long*, 322 F.3d at 554, would be rendered nugatory.[13] *See also In re Andresen*, 232 B.R. at 140; *In re Strand*, 298 B.R. at 376.[14]

12. Whatever the test used under § 523(a)(8), the courts generally acknowledge that the circumstances of most debtors in bankruptcy would entail some hardship with the survival of a debt obligation past discharge—but only a hardship that is "undue" will permit relief under § 523(a)(8). An early and oft-quoted observation is:

"... mere financial adversity without more will not do ... the point is that Congress meant the extinguishment of student loans to be an available remedy to those severely disadvantaged economically as a result of unique factors which are so much a part of the [debtor's] life, present and in the foreseeable future, that the expectation of repayment is virtually non-existent unless by the effort the [debtor] strips himself of all that makes life worth living."

*In re Briscoe*, 16 B.R. 128, 131 (Bankr. S.D.N.Y.1981), quoting from *In re Kohn*, 5 B.C.D. 419, 424 (Bankr.S.D.N.Y.1979).

13. There is an unresolved tension between this consideration, which *Long* undeniably injects into the process of decision, and *Long's* observation that where a debtor can "cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt *should* not be discharged..." 322 F.3d at 554–55 (emphasis added). That tension has to be resolved by two aspects of *Long's* text. First, the highlighted verb is "should" rather than "must," precatory rather than mandatory. Second, the Circuit observed that its would be a "less restrictive approach," 322 F.3d at 555. Ultimately, this conundrum must be resolved by an appellate forum, most appropriately the Eighth Circuit itself.

14. One thing that is utterly clear in the wake of *Long* is that the trial courts in the Eighth Circuit have no business applying any test formulated under § 523(a)(8) other than the wide-ranging inquiry of *Andrews*. Thus, the structure of argument that both sides presented in this matter was to some extent ill-put, based as it was on an analysis eschewed by the Eighth Circuit in *Long*, 322 F.3d at

In carrying *Andrews* forward after two decades, *Long* establishes that the undue-hardship analysis is not "progressive" or sequential. This means that the articulated test does not proceed by stages; therefore, a debtor does not lose for a failure to meet a particular stage.[15] Ultimately, the trial court is to consider the whole mix, assigning appropriate weight individually to "the unique facts and circumstances that surround the particular bankruptcy," 322 F.3d at 554. *See also In re Andresen*, 232 B.R. at 136 (recognizing trial court's "judicial discretion within the confines of defining and determining undue hardship") and 140 (acknowledging that totality-of-circumstances test "ensures an appropriate, equitable balance [between] concern for cases involving extreme abuse and concern for the overall fresh start policy") (interior quotes omitted).

The framework, then, is a single and simultaneous consideration of this Debtor's whole picture. On the record presented, this is an extremely difficult call.

On the one hand, there is the patent fact of a very large educational loan burden, in a dollar-amount of many multiples of the value of the Debtor's meager assets. This debt structure appears to whelm her resources to generate income to service it. The Debtor identifies the debt's very existence as a major stressor to her, tipping the precarious balance of her mental health regimen. She has the support of psychiatric professionals in that conclusion.[16] Two things are utterly manifest: the centrality of the debt in the Debtor's daily attentions, and its clear portent as a badge of career failure to an intelligent person educated to be a high-level professional but struggling against an intractable mental illness. Call it another exemplar of self-fulfilling prophecy if one must, or even a self-serving excuse in some unknowable part; however, the mere existence of this debt burden clearly is a significant block to the Debtor's recovery from mental illness. If this is not one of those "unique facts and circumstances" that play into the analysis under *Andrews* and *Long*, then nothing is. In an intangible but very real sense, it imposes a very significant hardship on the Debtor and her husband.

On the other hand, it was the Debtor's burden to make out the undue hardship she pleaded when she commenced this proceeding. *See* cases cited *supra* at p. 826. That requirement has been defined by the Eighth Circuit in an iteration that gives substantial weight to financial consider-

---

555. The ill-placement is not attributable to counsel, though. In citing such decisions as *In re Frech*, 62 B.R. 235 (Bankr.D.Minn. 1986), *Shoberg v. Minn. Higher Educ. Coordinating Council*, 41 B.R. 684 (Bankr.D.Minn. 1984), and *Cossette v. Higher Educ. Assistance Foundation*, 41 B.R. 689 (Bankr. D.Minn.1984), counsel were just doing what comes naturally to advocates, trying to conform their arguments to the expressed predilections of the presiding judge. The ill-placement is attributable to that judge, the author of those decisions, who was not explicitly "acknowledg[ing] and follow[ing] the controlling *Andrews* standard," 322 F.3d at 555. *Frech*, *Shoberg*, and *Cossette* are simply no longer viable as support for argument in a proceeding under § 523(a)(8).

15. The test applied in *Shoberg*, *Cossette*, and *Frech* was the one first framed in *In re Johnson*, 5 B.C.D. 532 (Bankr.E.D.Pa.1979); it was to be applied sequentially. *Cossette*, 41 B.R. at 691; *Frech*, 62 B.R. at 240–242.

16. At trial, Dr. Jones testified that the Debtor clearly "experiences [her] indebtedness as a stress," and that the substantial burden of her educational-loan indebtedness causes a sense of hopelessness and a feeling of being overwhelmed. This, in turn, causes her to experience the more significant symptoms of clinical depression.

ations. *Long* clearly envisions the simple dollars-and-cents circumstance of ability to pay as a crucial factor:

> Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt should not be discharged.

322 F.3d at 554–55.

In the last instance, the Debtor did not establish, as a matter of fact, that she lacked all means to pay down all of the component loans in her educational debt structure. The hard financial evidence, even that which she proffered, does not bear out her conclusory protestation that she had no more than $100.00 per month in disposable household income.[17]

So this proceeding presents a debtor who has some repayment ability in fact, which could be applied to a portion of the referent debt.[18] However, she maintains with some credibility and some professional support that the looming of her educational loan obligations hampers her in coping with a deep mental illness, and that the sheer length of any of the proposed amortizations would impose undue hardship on her in that light.

█ In the last instance, it must be open to a trial court to consider the non-pecuniary effects of a debtor's very substantial student loan burden, in passing on the issue of undue hardship under § 523(a)(8). To deny that would neglect *Andrews's* specific inclusion of the third, catchall category of relevant circumstances. It would ignore *Long's* renewed endorsement of a broad, holistic, non-sequential, and less technical evaluation of a debtor's life, circumstances, and prospects, as they inter-relate with educational loan obligations. It would relinquish the judicial discretion to define and determine undue hardship that the *Andresen* panel expressly considered to be so important. Finally, it would overlook the plain language of the statute—something to be eschewed under most of the Supreme Court's bankruptcy jurisprudence for over a decade.[19] After all, had Congress in-

---

**17.** As noted above, at p. 829, there seems to have been a fundamental flaw in one aspect of the Debtor's theory of this litigation: the way and extent to which her husband's child support obligation was to be factored into her household fisc. The confusion on this ultimately is settled by his paycheck stub: his wages, as actually received, are net of this obligation, because monies are withheld to meet it as it accrues. Thus, the amount of the obligation may not be considered as a deduct on the household expenditure side. The amount in question—about $370.00 per month—does not quite make the difference between the income-surplus as found here and the lesser amount asserted by the Debtor. However, it is the majority of it.

**18.** For the ultimate holding on dischargeability, the repayment ability would be compared to the amortization of the individual debts owing to the Defendants, and those matching in total amount to the surplus income would be excepted from discharge. *In re Andresen,*

232 B.R. at 137 (where debtor has not consolidated multiple educational loans, the "application of § 523(a)(8) to each of . . . [the] loans separately [is] not only allowed, it [is] required . . .").

**19.** *E.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1 (2000); *Rake v. Wade,* 508 U.S. 464, 472–473, 113 S.Ct. 2187, 2192–2193, 124 L.Ed.2d 424 (1993); *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. Partnership,* 507 U.S. 380, 387, 113 S.Ct. 1489, 1494, 123 L.Ed.2d 74 (1993); *Patterson v. Shumate,* 504 U.S. 753, 758, 112 S.Ct. 2242, 2246–2247, 119 L.Ed.2d 519 (1992); *Taylor v. Freeland & Kronz,* 503 U.S. 638, 642, 112 S.Ct. 1644, 1647–1648, 118 L.Ed.2d 280 (1992); *Barnhill v. Johnson,* 503 U.S. 393, 395–400, 112 S.Ct. 1386, 1388–1391, 118 L.Ed.2d 39 (1992); *U.S. v. Nordic Village, Inc.,* 503 U.S. 30, 32–37, 112 S.Ct. 1011, 1014–1016, 117 L.Ed.2d 181 (1992); *Union Bank v. Wolas,* 502 U.S. 151, 160–162, 112

tended the issue of educational-loan dischargeability to be governed exclusively by pecuniary factors, by the raw ability to pay something on a loan, it would have structured § 523(a)(8) as it did 11 U.S.C. § 1325(b).[20]

■■■■ The corollary is that it has to be open to the trial court to assign appropriate weight to non-pecuniary circumstances, and even to assign such factors greater weight than a potential ability to make payment. Otherwise, there would be no meaning to the *Andresen* panel's endorsement of an equitable balancing, a judicial flexibility to address all cases that fall between obvious debtor abuse of the discharge and utter penury, disability, and hopelessness. Of course, such weighting should be assigned only when an educational-loan balance is very substantial in relation to a debtor's net worth and annual gross income, where the standard and restructured amortizations would extend over a very long period, *and* where the presence and awareness of that great and ongoing liability have a demonstrated, detrimental impact on the debtor's physical or mental health. The priming of such considerations, a holding of undue hardship

despite a demonstration of some ability to pay, should not be done or made lightly. It would be only in the rarest of cases that the override would lie, and relief given to such a debtor. Nonetheless, to give fullest effect to the "less restrictive approach" and the "fairness and equity" referenced in *Long,* 322 F.3d at 554, the option must be recognized as available.

■■■■ Here, the Debtor has been most accurately diagnosed as suffering from "[m]ajor depressive episode, recurrent, severe," "[p]anic disorder with history of agoraphobia," and "[p]ersonality disorder ... with borderline, histrionic, and narcissistic features, including some evidence of dissociation under stress." [21] She has been professionally recognized as subject to "[p]sychosocial stressors related to problems with," *inter alia,* "economic problems and problems related to the interaction with the legal system." [22] Her "notabl[e] distress[ ] with regard to her financial obligations, previous bankruptcy experience, and the continuing struggle to remain solvent in the face of her experience of overwhelming indebtedness" was recognized on evaluation as a major stressor,[23] Her depression, panic attacks, and "brief suicidal

S.Ct. 527, 533, 116 L.Ed.2d 514 (1991); *Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.,* 502 U.S. 32, 38, 112 S.Ct. 459, 463, 116 L.Ed.2d 358 (1991); *Toibb v. Radloff,* 501 U.S. 157, 160–161, 111 S.Ct. 2197, 2199–2200, 115 L.Ed.2d 145 (1991); *Hoffman v. Connecticut Dept. of Income Maintenance,* 492 U.S. 96, 101–102, 109 S.Ct. 2818, 2822–2823, 106 L.Ed.2d 76 (1989) (plurality opinion); *United States v. Ron Pair Ents., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989); *Contra, BFP v. Resolution Trust Corp.,* 512 U.S. 1247, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994); *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

20. One of the well-known federal canons of statutory construction is that a failure by Congress to include particular language in one

provision of a statute is to be presumed intentional, when it has used the same language elsewhere in the same statute. *NLRB v. Bildisco,* 465 U.S. 513, 522–523, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). In §§ 1325(b)(1)-(2), Congress made confirmation of a Chapter 13 plan dependent on a debtor's commitment of "all of the debtor's projected disposable income" over a three-year period, with "disposable income" defined through the very same household-income-and-expenses considerations of the first two *Andrews* factors.

21. Functional Disabilities Evaluation by Robert B. Jones, M.D., at 9–10 (in evidence as Plaintiff's Exhibit 1) ("Jones Evaluation").

22. Jones Evaluation at 10.

23. Jones Evaluation at 3.

thoughts and dissociative episodes" continued during the pendency of this litigation despite the fact that she was taking concerted action to try to cope with this problem.

The Debtor's expert witness did not give an opinion as to whether a lifting of that burden would significantly lessen the stress of daily life for which the Debtor lacks normal coping mechanisms. Neither did he opine as to whether the Debtor's recovery from mental illness would be promoted or hastened by that.[24]

Nonetheless, the inference is utterly clear: relief from a very large long-term debt, otherwise nondischargeable in bankruptcy, would take a very significant stressor out of the Debtor's life and consciousness. The worry over repaying it, and her dread of the consequences of being sued, would be gone. Perhaps more importantly, so would one gnawing reminder of her frustrated hope to be a productive member of a respected profession. It is a matter of inference, but one that has ample support in the record: the extraction of her educational-loan liability from her financial picture would lessen her overall stress level, mitigate her distractability, and significantly reduce the chances of recurring depression and decompensation. At the very least, the Debtor would be deprived of one major, seemingly irresolvable excuse for not tending more zealously to her psychological recovery, through therapy and by responsibly confronting other stressors more within her grasp.[25] On the other hand, there is really no doubt that preserving the Debtor's liability for even a portion of her educational loan burden would impose a hardship on her. It would perpetuate a recognizable and significant impediment to her psychological recovery.

And, as it must be said, under the totality of her circumstances the hardship would be "undue." This is a suffering human being, imperfect as all of us are, shackled by a fundamental sense of personal failure and reminded of that every day. She may not have always made the most well-informed choices of employment; she probably has not always performed with optimal effectiveness in the jobs she took. Nor, earlier, did she take the most directed and energetic actions in trying to parlay her educational credentials into a life in the law. Not a one of us can truthfully claim to have done all of those things without fail, throughout life and particularly in early adulthood. The Debtor is now more fully aware of the deep limitations that her psychological makeup puts on her career development, and she now is much more honest about them. She has consistently made an effort to be self-supporting, admittedly at a much lower level, but one with results consistent with her limitations.[26] Her fairly tenuous grasp on these reduced expectations could fail, were the stressor of continuing liability on her edu-

---

24. The reason is self-evident from the text of his report: that is not what he was engaged to do. His task was to evaluate whether the Debtor was capable of working as a practicing attorney, or in some other capacity within a client-centered practice of law, and that is what he did.

25. These include marital conflict and difficulties with extended family, both recognized by Dr. Jones and her several treating mental health professionals.

26. As the Bankruptcy Appellate Panel has noted, the very first educational-loan nondischargeability statute was apparently prompted by "incendiary" but "isolated" and anecdotal accounts of "students discharging their educational obligations on the eve of lucrative careers" in business and the professions. *In re Johnson*, 218 B.R. 449, 451 (8th Cir. BAP 1998). The debtor at bar may nominally possess a professional credential, but her prospects are far, far removed from those recited in such apocryphal legislative evidence.

cational loan burden, or even a portion of it, to continue. This danger is what makes the hardship of a continuing exception from discharge "undue."

■ As noted earlier, subordinating financial circumstances to non-pecuniary ones under the *Andrews* test should be reserved only for the extraordinary case, one where the potential of non-pecuniary hardship is manifest, palpable, and of great magnitude. This is one such. Nondischargeability poses such negative consequences to the Debtor's mental health recovery, that they outweigh her current ability to make payment on at least a portion of her educational loan obligations. Bankruptcy has always been a refuge from unwise decisionmaking in financial matters, and from the financial results of unforeseen disaster in personal affairs. It should, and will, function as such for the Debtor here. *Cf. In re Strand*, 298 B.R. at 377; *In re Korhonen*, 296 B.R. at 497.

### Order for Judgment

On the memorandum of decision thus made,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. Excepting the Debtor's obligations to Defendants HEMAR, PHEAA, U.S. DOE, ECMC, and TERI from discharge in BKY 00–32707 would impose an undue hardship on her and her dependents.

2. Accordingly, the Debtor's obligations to the Defendants identified in Term 1 were discharged in the due course of BKY 00–32707.

LET JUDGMENT BE ENTERED ACCORDINGLY.