**In re Nancy J. POLLARD, Debtor.**

**Nancy J. Pollard, Plaintiff,**

**v.**

**Superior Community Credit Union, Defendant.**

**Nancy J. Pollard, Plaintiff,**

**v.**

**Educational Credit Management Corporation, Defendant.**

**Bankruptcy No. 02–50312.**
**Adversary Nos. 02–5024, 02–5025.**

United States Bankruptcy Court,
D. Minnesota.

Feb. 24, 2004.

Gwen Updegraff, Legal Aid Service of Northeastern Minnesota, for debtor.

Robert R. Kanuit, Hermantown, MN, for Superior Community Credit Union.

Christopher M. McCullough, Minneapolis, MN, for Educational Credit Management Corporation.

## MEMORANDUM DECISION

GREGORY F. KISHEL, Chief Judge.

These jointly-administered adversary proceedings for determination of dischargeability of debt under 11 U.S.C. § 523(a)(8) came on before the Court for trial. The Plaintiff ("the Debtor") appeared by her attorney, Gwen Updegraff, Legal Aid Service of Northeastern Minnesota. Defendant Superior Community Credit Union ("SCCU") appeared by its attorney, Robert R. Kanuit. Defendant Educational Credit Management Corporation ("ECMC") appeared by its attorney, Christopher M. McCullough. Upon the evidence received at trial and the arguments and memoranda of counsel, the Court memorializes the following decision.

## PARTIES

The Debtor filed a voluntary petition under Chapter 7 on April 5, 2002. During two different courses of study at Lake Superior College ("LSC") in Duluth, Minnesota and at the University of Wisconsin–Superior ("UWS"), the Debtor took out ten separate loans under programs guaranteed by the United States through its Department of Education. She also financed her courses at UWS through six more loans from SCCU. All of these loans are evidenced by promissory notes. The Debtor has not taken any action to consolidate any of them under any public or private program.

Via assignment, ECMC currently holds the rights to payment under the first group of promissory notes. SCCU holds the rights to payment under the loans it originated.

## GOVERNING LAW

■ This adversary proceeding sounds under 11 U.S.C. § 523(a)(8). That statute creates an exception from discharge in bankruptcy "for an educational...loan made, insured or guaranteed by a governmental unit ..." This exception from discharge is self-executing; it does not require a court adjudication to make it effective. H.R. REP. No. 595, 95th Cong. 1st Sess. 79 (1977), U.S.Code Cong. & Admin.News 1978, p. 5963. The Debtor, however, maintains that allowing this exception to lie would "impose an undue hardship on" her and her dependents, within the meaning of the later text of § 523(a)(8). Thus, she seeks a determination that all of her educational loan debts were dischargeable, and were in fact discharged, in her bankruptcy case. As the proponent of an exception to the exception from discharge, the Debtor has the burden to prove her entitlement to it. *In re Ford,* 269 B.R. 673, 675 (8th Cir. BAP 2001); *In re Svoboda,* 264 B.R. 190, 194 (8th Cir. BAP 2001); In *re McCormick,* 259 B.R. 907, 909 (8th Cir. BAP 2001); *In re Cline,* 248 B.R. 347, 351 (8th Cir. BAP 2000).

■ A determination of undue hardship under § 523(a)(8) is an issue of law. *In re Long,* 322 F.3d 549, 553 (8th Cir. 2003). In this Circuit, this issue requires an examination of the facts and circumstances that bear on the debtor's ability to make payment on account of the educational loans in question, and that otherwise go to the issue of hardship. *In re Long,* 322 F.3d at 553; *In re Andrews,* 661 F.2d 702, 704 (8th Cir.1981). The factors relevant to this inquiry include:

1. the debtor's past and present financial resources, and those the debtor can reasonably rely on for the future;

2. the reasonable necessary living expenses of the debtor and the debtor's dependents; and

3. "any other relevant facts and circumstances surrounding each particular bankruptcy case."

*In re Long,* 322 F.3d at 554; *In re Andrews,* 661 F.2d at 704. *See also In re Andresen,* 232 B.R. 127, 132 (8th Cir. BAP 1999) (cited with approval on this point in *Long,* 322 F.3d at 554).

## FINDINGS OF FACT

### *The Debtor's Age and Family Status.*

The Debtor is presently 50 years old. As of the date of trial, she was the single parent of two minor children; six weeks after the trial, the older of them reached the age of 18. Without telling the Debtor, he had met all class-credit requirements for graduation from high school several weeks before trial, and had received his diploma. As of the date of trial, he was still living in her household; however, he had announced his intention to move out within four months. The younger of the two sons will turn 18 in November, 2005; he will graduate from high school in June, 2006. A third son, the oldest, was an emancipated and independently-living adult as of the date of trial, having left the Debtor's household a few weeks earlier. The Debtor's marriage to her children's father was dissolved in 1990.

The Debtor is a resident of Duluth, Minnesota. She has owned and lived in a home of modest value for approximately 19 years.

### *The Debtor's Education and Employment History.*

The Debtor graduated from one of the Duluth high schools in 1971. She briefly attended a local vocational school, and then worked at a low-wage industrial job for seven months. After that, she took a six-month program of medical-clerical instruction at a school in Rochester, Minnesota.

After a short ensuing residence in West Germany, she took employment with St. Luke's Hospital in Duluth as a unit coordinator. Her duties included the transcription of doctors' orders, answering the telephone, and initially responding to patients' call lights. After five years of this employment, her ending rate of pay in 1979 was $8.60 per hour.

In 1979, the Debtor got married and moved to Seattle with her husband. While there, she was employed for a short period of time as a unit coordinator at a hospital. She then had and raised her three sons.

Going through the dissolution of her marriage, she returned to Duluth in 1990. She began receiving public assistance from the Aid to Families with Dependent Children program. Enrolling at Duluth Community College ("DCC"), she received an A.A. degree in 1992; as to a major, she testified that this was "like a liberal arts degree." While enrolled at DCC, she had planned to obtain a bachelor's degree in biology in followup studies.

To do that, she enrolled at UWS, hoping to enter UWS's Wilderness Biology Program. However, she found that having custody of her minor children would have prevented her from meeting its field work requirements. After considering a career in social work, she "decided occupational therapy would be a good fit" for her goals and temperament.

Ultimately, however, difficulties with one of her sons (truancy and troubles with the law) and with her ex-husband (his bid for a change of child custody) prevented her from meeting the occupational therapy program's requirement of substantial volunteer work in the community. Though the Debtor attended UWS for three years, she did not complete a bachelor's degree program there.

After an eight-month period of short-term employment, the Debtor enrolled at LSC in Duluth in the spring of 1996 for a program to be trained as an occupational therapy assistant ("OTA"). After considering the competing demands of parenthood, education, and employment, she had decided that this program and job would allow an appropriate balance among them. She abandoned her prior goals of a four-year degree in the occupational therapy field and employment as a full-fledged occupational therapist.

She completed LSC's OTA program in the spring of 1998. In her final quarter—and only then—she found that the prevailing market for the position in the immediate Duluth area was poor; the prevailing starting wage was $8.00 per hour and there was little chance of significant increase from that. She tried to get hired by the State of Minnesota at the state psychiatric hospital then open in Moose Lake. She was unsuccessful. This was the only OTA position she was able to find in Northeastern Minnesota that would have paid appreciably more than the rate prevailing in Duluth. The Debtor did not take the state OTA certification examination at the time, because she did not have $200.00 for the associated fee. She has never obtained OTA certification.

In August, 1998, St. Luke's Hospital re-hired the Debtor as a health unit coordinator on a part-time basis, to average three days per week. Over the ensuing 40 months, she took as many extra hours as she could. Ultimately she had a schedule that fluctuated from four days per week to full-time. She advanced in hourly rate of pay from $10.65 to $12.00. During this time, she also took some outside employment—two month-long temporary part-time jobs in telemarketing and electronically scanning medical charts.

However, on January 7, 2002, St. Luke's terminated her employment. The apparent reason was a violation of the confidentiality of her ex-husband's patient medical records.[1]

The Debtor then was unemployed for a period of seven months. Her applications to various local medical providers—St. Mary's Medical Center; the Cloquet, Minnesota hospital; nursing homes; and physicians' offices—as well as the Lake County Sheriff (for a position as jailor) were all unsuccessful; they did not generate a single interview.

From August until mid-October, 2002, the Debtor delivered telephone books. Paid on a per-piece basis, she made gross wages of between $130.00 and $190.00 per week.

In mid-October, 2002, the United States Postal Service hired the Debtor as a "casual mail carrier," a temporary position without benefits in which she both collected and delivered mail. The Debtor was hired for two 89-day periods on this arrangement. The latter of them was to terminate on June 28, 2003. As of the date of trial, the Debtor was actively searching for employment to follow that. She was daily

---

1. At the time, the Debtor and her ex-husband were going through a trial modification of their child custody arrangements, with the ex-husband apparently assuming physical custody of one or more of their sons. Post-decree court proceedings were pending; the issue of medical insurance coverage for the children came up. The ex-husband told the family court that he had no medical insurance coverage available. The judge then ordered the Debtor to enroll the children on her coverage through St. Luke's. The Debtor, *pro se* at the time, inspected her ex-husband's chart at St. Luke's. She found that he had used medical insurance for a recent hospitalization, and she reported that to the judge. After the ex-husband and his attorney complained to St. Luke's, the Debtor's employment was terminated.

checking the web page of the Minnesota State Job Service, and had reapplied to the State of Minnesota for an OTA position. She also hoped to parlay her experience with the Postal Service to a permanent job with that employer or with a delivery service like FedEx. She testified from her investigation that FedEx's starting rate of pay for a delivery person was $14.00 per hour.

As of the date of trial, the Debtor was dispirited about her lack of success in finding employment as an OTA at an adequate wage in the Duluth area. She stated that, as a result, she had no plans to seek state certification for the position. She also stated that she did not intend to look for employment outside Northeastern Minnesota. As reasons, she cited local ties to extended family, her youngest son's continuing presence in her household, and the need to provide him a continuing stable environment.

### Debtor's Household Income.

From her temporary employment with the United States Postal Service, the Debtor was receiving net income of $1,800.00 to $1,850.00 per month. She earned this while working an average of about 41 hours per week.[2] The only amounts withheld from her gross wages were for state and federal income tax, Medicare tax, and social security. As a temporary employee, she was not participating in a retirement plan and she was not given medical insurance coverage as a benefit. She did not receive an overtime differential for the small number of hours she worked over 40 per week.

The Debtor had only one other periodic source of income, child support from her ex-husband. Under the most recent applicable family court order, he was to pay the Debtor $366.00 per month for the two children then in her household. This obligation was calculated on the number of children below 18 and in her physical custody. The Debtor expected the amount to drop when her second son reached 18; her ex-husband's obligation of current payment would terminate entirely in June, 2006, with their youngest son's graduation from high school. For years, her ex-husband had been irregular in his payments, having accrued arrears owing to the Debtor of over $3,000.00. During the two months preceding trial, he had paid only $246.00 per month. The Debtor testified that over an extended period, she had received an average of only $260.00 per month.[3] Though the ex-husband was under threat of legal sanction, the Debtor was not optimistic about receiving all of the back child support to which she was entitled.[4]

With two dependent children in her household, the Debtor was also entitled to participate in the Energy Assistance program. For the winter of 2001–2002, she

---

2. The figure for hours worked was calculated from the three representative paycheck stubs in evidence. The wage figure was found from the Debtor's testimony, which was consistent with the mensualized average of $1,864.00; that, in turn, was calculated from the bi-weekly paycheck stubs in evidence using a conversion factor of 4.3 weeks per month.

3. The Debtor's testimony was corroborated by a written report from the St. Louis County Social Services Department, received into evidence as Plaintiff's Exhibit 2.

4. The sanction was to be suspension of his Minnesota driver's license. Under the state program of child support enforcement, he had agreed to this consequence if he did not maintain currency on the accruing obligation and on a scheduled reduction of the arrearages. The Debtor testified, however, that he had "kind of moved to Missouri," and she opined that as a result losing his Minnesota license "might not matter."

had received a total grant of $600.00 to help cover her winter heating bill. Under Energy Assistance program requirements, the amount of her future grant entitlement would drop with her second son's departure. She anticipated not qualifying at all once her youngest son turned 18.

Finally, due to the level of her income from employment and the presence of dependent minors in her household, the Debtor had been entitled to receive an Earned Income Credit payment for several years before trial. This is a benefit for working families of low income that is requested by filing a federal tax return. In the year just before trial, the amount of her federal income tax refund plus her Earned Income Credit entitlement— "$1,500.00 to $2,000.00" per her testimony—had been "intercepted" to apply to her delinquent federally-guaranteed educational loans. Again, though the Debtor expected to be able to claim this benefit for tax year 2002 and after, she anticipated that it would drop after that year due to the emancipation of her second son and that it would end entirely after tax year 2006.

### The Debtor's Household Expenses.

The Debtor estimated the monthly expenses for maintaining her household, averaged on an annualized basis, to be as follows:

| | |
|---|---|
| Mortgage Payment | $ 460.00 |
| Property Taxes (currently accruing) | $ 100.00 |
| Homeowner's Insurance | $ 60.00 |
| Utilities | |
| Electricity | $ 100.00 |
| Heating | $ 75.00 |
| Water/Sewage | $ 50.00 |
| Garbage Collection | $ 35.00 |
| Telephone (Cell) | $ 42.00 |
| Internet Access | $ 42.00 |
| Transportation | |
| Gasoline | $ 60.00 |
| Automobile Insurance | $ 46.44 |
| Home Maintenance | $ 50.00 |
| Food | $ 400.00 |
| Clothing | $ 50.00 |
| Laundry | $ 40.00 |
| Recreation/Entertainment | $ 30.00 |
| TOTAL: | $ 1,640.44 |

All of these expenditures are reasonable in amount, and all are reasonably necessary to maintaining a modest but secure life in the Duluth area. Singly or jointly, the Defendants objected to only three of these items. None of the objections have merit.

■ The Debtor testified, credibly enough, that she needed home Internet access for her job search and even for employment applications. She was actively using the web site for the Minnesota State Job Service at the time of trial. For this reason alone, as well as many other predictable and unpredictable ones, this expenditure must be deemed reasonably necessary to her and her dependents' maintenance.[5]

■ On a very different sort of expenditure, the finding made for the amount of the Debtor's food expense is $100.00 greater than that to which she stipulated before trial. This adjustment accords with her testimony. She stated, again credibly enough, that she had underestimated the actual amount she spent. The adjusted amount is reasonable enough for a household then of three members, or even of just two if one is a teenage boy.

---

5. This conclusion probably would have been beyond the pale for most Americans a decade ago. Five years ago, it was at least debatable. With the mounting prominence of e-commerce, the efficiencies of e-mail communication for job and family purposes, and the growing possibilities of telecommuting for many varieties of work, a powerful personal computer and home Internet access have become a *de facto* necessity for the maintenance of a middle-class lifestyle, even a modest one. The proof of this lay in the Debtor's unrebutted testimony on two points. First, she had found that they were essential to her job search. Second, her employer during the time she was delivering telephone books had required her to maintain an e-mail address for communication and scheduling.

■ Finally, her use of a cell telephone is not a luxury. It is her only form of telecommunication; as of the date of the trial, she did not maintain a "land-line" telephone installed at her home.[6] Alternatively, she noted that she had been required to maintain a personal cell phone during her employment delivering telephone books, and that she might again be required to have one for a future job in the delivery-service industry.

The Debtor testified to her need to make certain other expenditures to maintain employment and household. All of them are reasonably to be anticipated, presently or in the relevant future, and all of them are reasonable in amount. They are included in the following:

| | |
|---|---|
| Medical Insurance Premium | $150.00–200.00 |
| Uncovered/Deductible/Co–Pay Medical Expenses | $ 50.00 |
| Payment on Delinquent Real Estate Taxes | $ 75.00 or more |
| Replacement of Automobile | $200.00 |
| Automobile Maintenance | $ 50.00 |
| Emergency Reserve | $100.00 |
| TOTAL: | $625.00–$675.00 |

These categories of predictable expense go beyond those to which the Debtor stipulated-and, in one instance, beyond those to which she testified. However, attributing all of them to her household's actual operation is amply warranted.

■ The Debtor had been without medical insurance for herself or her children since the termination of her employment at St. Luke's. She testified (without objection) on the estimated premium she had been told she would pay for inclusion in the state-sponsored MinnesotaCare program for otherwise-uninsured families of low and moderate income. Similarly, nothing controverts her statement that once her youngest child was emancipated, she probably would not qualify for MinnesotaCare and she could expect to pay at least $200.00 per month for medical insurance on an open-market policy.[7] The Debtor testified that as of the date of trial she was in the process of applying for coverage under MinnesotaCare. For a gross household income of $2,408.28, her monthly premium for coverage for two people would have been $178.00.[8] If the Debtor were to obtain employment with a medical insurance benefit, of course, this expense category would no longer be directly relevant.

Either way, allowance must be made for an additional category of medical expense. With the narrowing scope of benefits under most private medical-insurance plans, it is not unreasonable to expect to pay an average of $50.00 per month to cover annual deductibles, co-pays, and the small balances of regular providers' charges not covered by insurance; all of these are rapidly becoming ubiquitous.[9]

6. Her service had been disconnected several years earlier for nonpayment of a large accrued bill; even after her bankruptcy filing, she was unable to afford the deposit required for reconnection.

7. It is only fair to note that there is no documentary corroboration of the Debtor's testimony on her MinnesotaCare eligibility. The program booklet pages in evidence as Plaintiff's Exhibit 15 do not show the maximum gross income allowed for an eligible one-person household, though they do show it for households of two and three people. That much being said, the Defendants did not controvert the Plaintiff's conclusory testimony, either via evidence or via citation to an applicable Minnesota state regulation.

8. The gross income figure was calculated by mensualizing the average of the three biweekly paychecks from the Postal Service in evidence as Plaintiff's Exhibit 1, and adding $260.00 to account for child support. The premium figure was taken from the tables in Plaintiff's Exhibit 15.

9. The Debtor did not testify to her or her youngest son having any serious ongoing medical problems or psychological illnesses; to all appearances, she was in good health herself.

■ More ominously, the Debtor testified to being very delinquent for the preceding four years on the real estate taxes for her homestead, in an amount that very nearly totaled $7,000.00.[10] She testified that were she to prevail in these adversary proceedings, she would apply her income tax refunds to reduce it. In any event, though, she would have "to put money away every month" for it. Taking the broad terms of the "ten-year plan" that can be negotiated with Minnesota county governments to pay off such delinquencies, an even amortization over such a period with a small component creditable to interest would require her to come up with a minimum of $75.00 per month on average.

■ The Debtor currently has no debt-service obligation for a vehicle. However, she reasonably expected to have to replace her middle-aged, low-value automobile within five years. She expected to have a payment on auto financing of $200.00 to $300.00 per month after that. On that evidence, it is entirely reasonable to attribute an expense category for vehicle replacement of $200.00 per month on an ongoing basis. This would account for an ongoing savings reserve for a finance-free purchase or a large down payment, a later payment on necessary financing, or both of the latter two. The Debtor included no line-entry for automobile maintenance in her own budget, even for quarterly oil changes and seasonal checkups. Given the age and low-end make of her automobile, one must attribute $50.00 per month on average to this additional—and inevitable—cost of personal transportation.

■ To similar effect, attributing $100.00 per month to an ongoing reserve for anticipated emergency or "contingency" expenses is entirely warranted, even though the Debtor did not do this. The *Andrews/Long* analysis requires some prognostication of life experience over the long term. Examples of longer-horizon .expenses might include larger health-care expenses that are uncovered by insurance—the Debtor is at that stage of life where medical and dental issues begin to emerge, no matter how healthy one has been in younger years—additional major home repairs, or catastrophic property damage or loss. Making such an allowance is particularly warranted for households of low or moderate income, which generally lack current resources, the wherewithal to save larger amounts of money regularly, and credit-worthiness to cover such unforeseens.

The total of these two groupings of actual and expected expenses is $2,265.44 to $2,315.44. In component or in the aggregate, this is a reasonable monthly budget for a low-to-moderate income household of two to three persons, in the Duluth area. The Debtor could not reduce any item by a margin meaningful to the disposable-income analysis without jeopardizing the thin balance of safety and well-being that her modest habits support.[11] The Debtor expected that the total of these expenditures would stay level in inflation-adjusted dollars for the foreseeable future. In her estimation, the several expenses that would drop somewhat with the emancipation of her dependents would be offset by

---

10. The mere existence of this accumulated debt says something about the Debtor's past financial means, which will be discussed at greater length later.

11. Neither Defendant's counsel made any sustained commentary on any of the expense categories or their associated amounts, and none of their objections were strongly phrased. The Defendants' arguments that the Plaintiff's reasonable monthly expenses should not exceed $1,500.00 are simply not grounded in the evidence, let alone by real-life contemporary circumstances.

others that would rise with the aging of her house, vehicle, and personal property. Given the modest level of overall expenditure, kept down more by the Debtor's means than anything else, this forecast is reasonable.

### The Bottom Line.

■ The financial side of the *Andrews/Long* analysis starts by determining whether the debtor currently has an income surplus; in-hand income must be offset by reasonable living expenses. Then the debtor's future prospects for an income surplus should be gauged, to the extent that currently-available evidence allows it. *In re Long*, 322 F.3d at 554 and 555 ("reasonably reliable future resources" and "the prospect of future changes—positive or adverse—in the debtor's financial position" are relevant to undue-hardship inquiry).

The first step is a matter of simple arithmetic. The Debtor's top rate of compensation in her second unit-coordinator position at St. Luke's would have grossed her $480.00 for a full 40-hour work week. This would have translated to about $1,650.00 per month, net.[12]

Her temporary employment with the Postal Service thus represented an improvement, netting her $1,800.00 to $1,850.00 per month. This is a bit less than what she would make as a starting rate of pay with FedEx.[13]

Factoring in the two components of the Debtor's income structure, it is easy to determine the Debtor's experience on a historical basis. While she was employed at St. Luke's between 1998 and 2002, she netted $1,910.00 per month, at most—

$1,650.00 in wages, and an average of $260.00 in child support. During her term with the United States Postal Service, she netted $2,110.00 per month, at most— $1,850.00 in wages, and an average of $260.00 in child support.

This shows just why the Debtor piled up real estate tax arrearages over the several years before trial: with at least $2,200.00 in other current living expenses, she simply did not have enough income to pay the real estate taxes as they accrued. She certainly did not have any surplus income to apply to her educational loan debt, at any point over that five years.

Because the Debtor's employment status was unsettled as of the date of the trial, gauging future surplus income must rely to some extent on assumptions. Even positing a best-case scenario, however, the Debtor would be no better off.

Were she to stay with the Postal Service, or to be hired by a private delivery service, she would not start at an appreciably higher net earned income than she had at the time of trial; even FedEx's starting wage would not be markedly greater than the hourly rate she was making at the Postal Service. On balance, it is reasonable to assume that the Debtor will obtain employment at a wage comparable to the Postal Service's, or the wage she had at St. Luke's before her termination, $12.00 per hour. It is not reasonable to assume that she would make any more than that, or that future increases in her wages would be significantly greater than inflationary adjustments. Her only long-term work experience is in a lower-level medical-clerical position, one that did not

---

12. These figures were reached by using a conversion factor of 4.3 weeks per month, and then subtracting 20% to account for the various income and payroll tax withholdings.

13. At the $14.00 hourly wage to which the Debtor testified for FedEx, she would gross $560.00 per week, or $2,408.00 per month. Again, reduced by 20% for tax withholding, this would result in $1,925.00 per month net.

require lengthy formal education or training and one that is not highly compensated. Her vocational profile would support skilled employment in only one other position, that of OTA, and the Debtor's own search showed that position could not generate more in starting wage than the unit coordinator position she had left. Like it or not, in the way of skilled employment the Debtor clearly is boxed in to an income level like the one she has had for the relevant past. The less-skilled job in the postal sector did not do her any better, and there is no strong proof that an extension of this brief experience into private-sector delivery work would better her income materially.

Until mid–2006, the Debtor's earned income will be augmented by child support. The record does not directly establish the amount to which she would be entitled for one remaining minor child, but it does support a finding that it would be in the range of $300.00 per month.[14] The one certainty for the Debtor's future income structure is the loss of all child support, in a little over two years. This will drop the Debtor's in-hand household income by $260.00 to $300.00.

It does not require advanced arithmetic to recognize that the Debtor will have no surplus income to apply to educational loan debt for the mid-range future. Her in-hand income will not materially increase; in fact, it will drop by $260.00 to $300.00 per month in mid–2006. Her household expenses, which presently equal or exceed her in-hand income, will not decrease significantly until 2011 at the very earliest—when her mortgage, as presently constituted, is scheduled to be paid off.

### The Debtor's Assets and Other Financial Resources.

The Debtor testified to owning only two assets of a value beyond nominal. As of the date of trial, she had lived in the same home in the Lakeside neighborhood of Duluth for between 18 and 19 years. She had refinanced the mortgage-secured debt against it several years earlier. The remaining term on the loan was approximately eight years. The St. Louis County Assessor had given the property an estimated market valuation of $89,500.00 for the purposes of real estate taxes payable in 2001. However, this valuation was lowered to $55,000.00 for 2002 due to the substantial defects in the property's condition.[15] The Debtor testified without opposition that the house chimney needed full replacement, that there would be substantial associated stucco work, and that she had had major problems with the plumbing in the recent past. She expected to have to pay at least $2,000.00 to $3,000.00 to replace the chimney, and additional amounts for the other work.

The Debtor's only other significant asset is the 1999 Hyundai automobile she drives. It is free and clear of liens, but it had mileage of 69,000 as of the date of trial. The Debtor did not testify as to a value on direct or cross-examination, but really did

---

14. Under their divorce decree, the Debtor's ex-husband's obligation for two children was $366.00 per month. Under Minnesota statutory guidelines, the support obligation for two children is to be set at 30% of the obligor's net income, where that net income is between $1,001.00 and $5,000.00. Minn.Stat. § 518.551. An obligation of $366.00 per month works back to $1,220.00 in the obligor's net income. At this obligor income level the guideline factor for one child is 25%.

This would indicate a support entitlement of $305.00 per month.

15. The Debtor acknowledged that at this lower valuation she would have an equity in her homestead of not less than $20,000.00 to $25,000.00, less the sum of $10,000.00 that would be owing to her ex-husband as a part of the property division under the dissolution of their marriage.

not need to. Given the model, age, and high mileage, let alone its daily necessity to the Debtor, there is no way that this asset is a source of any meaningful liquid value for application to her educational loan debt.

The Defendants' counsel identified only one household resource outside of the Debtor's own income: the presence in her household of her second son, emancipated, graduated from high school, and employed at a local Red Lobster restaurant on a part-time basis of 25 to 30 hours per week, at $8.50 per hour. Though the Debtor had doubts about his ability to support himself outside her household, she testified that he firmly intended to move out within four months. The Debtor admitted that she had not called on him to contribute to the household fisc while he was in high school. When asked whether she would do so now, she testified that she did not "expect [him] to contribute" until he made his decision on whether to move out or not. Given the relative firmness of his expressed intention to do so, readily capable of inference from the record, it is clear that no augmentation of household income could be attributed to him for anything other than a very short term. In any event, he and his income certainly could not be deemed a long-term resource for the reduction of the Debtor's educational loan debt.

### The Debtor's Payment History.

On direct examination, the Debtor acknowledged that she had never made a voluntary payment on her educational loans, in any amount. She also stated that her federal tax refunds and her earned income credit benefits had been intercepted and applied to some portion of that debt, for at least two years. This was the only reduction of any part of this debt since its inception.

As a reason, the Debtor testified that there simply "wasn't anything left over to make payments," ever.

At least once, the Debtor had called Defendant ECMC or some intermediate assignee, to inquire about the possibility of consolidating her educational loans. She did not testify with any specificity as to what she was told, or whether there had been any follow-up on either side. She did attest to having had numerous dunning calls from collection agents, with conclusory demands that she make payment in "a big sum" that simply was beyond her ability to pay.

### The Debtor's Educational Loan Debt Structure.

The Debtor's debt to SCCU is evidenced by six promissory notes executed from 1992 to 1995.[16] As of June 2, 2002, the total of unpaid principal and interest under them was $13,292.27. All of the notes provided for a variable rate of interest; as of December 27, 2002, the current rate was 6.79% per year.

The total of the Debtor's debt to ECMC was $46,166.87 as of December 15, 2002.[17] Interest then continued to accrue at the rate of $5.78 per day.

The Debtor's obligations under all of these loans are eligible for consolidation under the William D. Ford Direct Loan Program.

As to the debt owing to ECMC alone, if one assumed the total loan balance just noted, a "weighted rate of interest of 5.988%," an adjusted annual gross income

---

16. The dates, amounts lent, and interest rates for these notes are identified in Term 2 of the Stipulation of Fact between the Debtor and SCCU. It is not necessary to recap this data in detail here.

17. This consisted of $35,194.34 in principal; $2,031.00 in accrued and unpaid interest; and $8,941.53 in costs.

for the Debtor of $23,916.00, and a family size of three, the Debtor's initial monthly payment obligations to ECMC under the Ford Program's four options would be as follows:

Standard
(10–year repayment period)      $512.26 [18]

Extended
(30–year repayment period)      $297.11

Graduated
(at beginning of 30–year repayment
    period)      $256.13

Income–Contingent      $148.27 [19]

If one assumed a total loan balance of $60,000.00 even (very close to the sum of the Debtor's debt to both Defendants), an interest rate of 5.988%, and adjusted gross income of $23,916.00, and a family size of one, the Debtor's initial monthly payment obligation under the Ford Program's four options would be as follows:

Standard
(10–year repayment period)      $665.76

Extended
(30–year repayment period)      $359.27

Graduated
(for first two years of 30–year repay-
    ment period)      $332.88

Income–Contingent
(for first year, recalculated annually
    over 281–month repayment period)      $250.93 [20]

There is no evidence in the record as to the amounts of payment obligation on account of the Debtor's debt to SCCU alone, under the Ford Program or not.[21]

---

**18.** This, apparently, would be the result of an even amortization of the full balance over a ten-year period. Before the early 1990s, ten years was the customary repayment term on federally-guaranteed educational loans.

**19.** The Debtor and ECMC stipulated to these figures before trial.

**20.** These figures are taken from Plaintiff's Exhibit 21, a printout of a completed "Interactive Repayment Calculator Summary" from the website of the United States Department of Education. Using this facility, prospective

## DISCUSSION

For more than twenty years, the Eighth Circuit has endorsed a broadly-phrased rule of decision for proceedings under § 523(a)(8). It describes its frame of reference as a "less restrictive approach," and it identifies the standard as a "totality-of-the-circumstances test." *In re Long*, 322 F.3d at 554 and 553. *See also In re Andresen*, 232 B.R. 127, 135 (recognizing "judicial discretion within the confines of defining and determining undue hardship") and 141 (noting "the controlling *Andrews* test" as "simply allowing a broader consideration of the case and any factors specific to a given debtor's particular situation"). As the Eighth Circuit has observed,

> ... fairness and equity require each undue hardship case to be examined on the unique facts and circumstances that surround the particular bankruptcy.

*In re Long*, 322 F.3d at 554. *See also In re Andrews*, 661 F.2d at 704.

The Circuit expressly identifies only two such factors, the ones that show a debtor's ability to actually make payment on the subject debts. Income and other "reasonably reliable future financial resources" are to be reduced by the debtor's "reasonably necessary living expenses." *In re Long*, 322 F.3d at 554; *In re Andrews*, 661 F.2d at 704; *In re Andresen*, 232 B.R. at

---

applicants to the Ford Program can determine their payment obligations.

**21.** The stipulation of fact between SCCU and the Debtor does not recite a monthly amortization for the debt under the terms of the original notes; SCCU did not produce testimony or other evidence on the point. In his trial brief, its counsel stated the "total monthly payment required to keep all these loans current" was $164.00. However, the corroboration for this is not identified.

138. This part of the inquiry requires findings as to the debtor's present situation, "along with the prospect of future changes—positive or adverse—in the debtor's financial position." *In re Long*, 322 F.3d at 555.

Under *Andrews* and *Long*, the Bankruptcy Court may consider "any other relevant facts and circumstances surrounding [the] particular bankruptcy case." *In re Long*, 322 F.3d at 554. Since these decisions give an express warrant for a free-ranging inquiry, non-pecuniary circumstances may be assigned substantial significance in a determination of undue hardship; they even may be given pivotal weight, in the rare case. *In re Reynolds*, 303 B.R. 823, 839 (Bankr.D.Minn.2004). The analysis need not get to that point, however, if the debtor proves up a *de facto* inability to repay the debt over a relevant period of time. In such a case, the debtor will meet the burden, and will be entitled to a determination that the debt is dischargeable.[22]

This is such a case. The Debtor has demonstrated that she lacks the ability to make payment on her obligations to both Defendants and each of them, whether those obligations were amortized under the original notes or whether they were to be consolidated in whole or in part under the Ford Program. She has also demonstrated that she will lack repayment ability for the relevant future. As a matter of law, then, the exception from discharge would work an undue hardship on her, and on her remaining minor child for as long as he remains dependent on her. Thus, the Debtor wins.

Two observations first, gleaned from the decisions of the Bankruptcy Appellate Panel for the Eighth Circuit. Both of them go to the frame of reference under which the financial analysis is to be made:

1. The undue hardship analysis is to be applied to a debtor as that person is found at the time of trial—vocational profile, medical condition, net worth, actual earnings, family responsibilities, psychological impediments, and all. The debtor's future prospects for career change and advancement, income enhancement, and other personal improvement can be considered, but must be measured on hard evidence. Such prospects must be gauged against the aging of the debtor's educational credential, the debtor's historical experience in exploiting the credential, and the current and anticipated job markets in relevant field(s). Unfocused grunting about the huge abstract benefit of a particular educational credential is not only superfluous to this analysis; it actually hinders clarity in adjudication. Tendentious moralizing about the choices a debtor made for career paths and in choosing places to live and work is similarly unilluminating. *See, in general, In re Andresen*, 232 B.R. at 137–139 (rejecting sequential three-part tests in *In re Brunner [v. New York State Higher Educ. Services Corp.]*, 831 F.2d 395, 396 (2nd Cir.1987) and *In re Johnson*, 5 B.C.D. 532 (Bankr.E.D.Pa.1979); in particular, rejecting "policy analysis" stage of such tests and its focus on whether debtor "received benefit from" education financed by subject loans).

---

**22.** This precept is a negative inference from the Eighth Circuit's decision in *Long*. It is the only one reasonably to be drawn from the relevant text:

Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt should not be discharged.

*In re Long*, 322 F.3d at 554–555.

2. In identifying the dollar-amount of a payment obligation against which a debtor's payment ability is to be compared, the options for restructuring of educational loan debt available under the Ford Program are to be considered. In the last instance, the Ford Program functions as an indicant of the minimum for which a debtor could be held to account, if an income surplus actually shows from the evidence. In an oblique way, this precept emerges from the judicial gloss that the Bankruptcy Appellate Panel put on the Eighth Circuit's holding in *Long*, in its opinion on remand in that same proceeding. *See* 292 B.R. 635 (8th Cir. BAP 2003).

With those anchor points, the Debtor's situation in career and income, historical and anticipated, falls into perspective for an undue hardship analysis. She borrowed—in retrospect, heavily—to finance the acquisition of a vocational credential. However, the credential bore no realistic chance of enabling her to earn enough to begin to pay off the cost. Whether the Defendants appreciate it or not, the Debtor was significantly tied to the area of northeastern Minnesota for her job search.[23] This geographic limitation on the Debtor's options ultimately meant that she could not pursue the career for which she had prepared—she simply would not have earned enough, at first or for years, to even maintain herself and her children—let alone to pay off her educational loans.[24]

Thus, to some extent it is beside the point whether the Debtor made some sort of "good faith effort," of some extensive scope, to parlay the credential into a job. The only evidence on the potential rewards from such an effort shows that she did not financially backslide by abandoning her plans for a career change and by going back to her old position as a unit coordinator. The Defendants' insinuation that she could have landed and could now land employment as an OTA at a higher salary in the Twin Cities metropolitan area fails, for want of proof. There was no accompanying evidence of sufficient weight to establish the actual presence of such jobs at the relevant times, or that the Debtor had a reasonable likelihood of obtaining such a job.[25]

The Debtor is not making use of the credential that her loans from the Defen-

---

**23.** She was the single parent of minor children, for whom the maintenance of stability and local continuity was quite important. To a single parent, the local presence of extended family is even more important for support and tangible assistance than it is for two-parent households. Finally, as indicated by his later attempt at a change of custody, she had a restive ex-husband—whose reaction to an extended geographic move was unknowable but potentially negative, obstructive, and costly.

**24.** One wonders if the Debtor received any counseling at all on this issue from either Lake Superior College or UWS, early or late, let alone a frank appraisal. This mystery emerges in matters under § 523(a)(8) with disquieting frequency—particularly where the debtor's study was for a career in the "helping professions."

**25.** The insinuation also fails for proof of a necessary correlative—which would go to the ultimate fact, the existence of an income surplus. Prevailing wages for many occupations are indeed higher in the metropolitan area than they are in almost all of outstate Minnesota. However, so are most of the costs of living, including high costs for housing and for increasingly-long commutes between places of affordable housing and places of moderate-income employment. Would the one have offset the other, had the Debtor made the move or were she to make it now? As the proponent of this hypothetical, the Defendants had the burden of production; they had to rebut a *prima facie* case that the Debtor based on actual current circumstances. They did not carry the burden.

dants financed, but this is of no significance. Even were she to muster the resources to obtain OTA certification, and then were to seek entry-level employment in the position, she would make markedly less than what she was earning at St. Luke's and at the Postal Service without using OTA skills. Simply stated, at this point it makes much more financial sense for the Debtor to build on her non-OTA work experience than it would for her to try to exploit the paper OTA credential. As found earlier, pursuing the former would put her closer to a monthly break-even point on the maintenance of her household, but it certainly would not enable her to start reducing her educational loan debt.[26]

Taking the Debtor as she was found as of the date of the trial, one must conclude that she met the financially-oriented aspects of the undue hardship standard. In the last instance, the Debtor lacks any means to pay her educational loan debts, in whole or in part, restructured or not. That is certainly the case at present. It will continue to be the case through the year 2011 at earliest.

Unabashed, ECMC suggested that the anticipated payoff of the Debtor's homestead mortgage in 2011 should be factored into the undue hardship analysis. Simply put, this suggestion is over the top. Neither the statutory text, the legislative history, nor the judicial construction in

*Andrews* and *Long* could be reasonably applied to continue a debtor in nominal thrall to unpayable educational loans for the majority of a decade, only to trigger the depth charge of a payment obligation after that. Undue hardship under § 523(a)(8) must be measured as of the date of the trial, and for a reasonably-forecast near future alone. Basing an argument on the prospect of an income surplus eight years after trial, after the sweep of time could have opened up so many other potential variables, is just not humane. Nor is the position capable of a principled and rational adjudication, on presently-ascertainable facts. Finally, it would not be responsive to the generalized right of a debtor to a fresh start after bankruptcy. *See In re Andresen,* 232 B.R. at 140 (recognizing that "fresh start" considerations can be factored into the mix under § 523(a)(8); undue hardship adjudication should balance them against a "concern for cases involving extreme abuse ...."). *See also In re Korhonen,* 296 B.R. 492 (Bankr.D.Minn.2003) and *In re Strand,* 298 B.R. 367 (Bankr.D.Minn. 2003).[27]

In short, the Debtor has met her burden on the issue of undue hardship. She has proved that she lacks and will lack the ability to make payment on her debts to the Defendants. There is no other fact that would override the import of this showing. The Debtor certainly did not work any fraud or scheme on the edu-

26. As found earlier, either non-OTA option for continuing employment would net her about the same in income. Thus, it is not necessary to determine whether the Debtor even has a realistic prospect of again working in an administrative position in the health care industry in northeastern Minnesota. The sensitive circumstances of her termination from St. Luke's, and her two-year inability to get very far in being considered for another such position, do not strike a positive note for that option.

27. In both of these cases, ECMC had argued that a debtor who had no present payment ability and would never have it nonetheless had not made out undue hardship, because the Ford Program would accept him for an income-contingent repayment option and assign a current payment obligation of zero, subject to future review of income and employment status. The argument was decisively and properly rejected in both.

cational loan system; her dilemma is pretty much the result of uninformed choices in educational and career planning that had an exaggerated impact due to the pre-existing limitations on her vocational profile. Discharging the debt accrued in such an unfortunate sequence of events does not offend § 523(a)(8). *In re Reynolds*, 303 B.R. at 840–841.

## ORDER FOR JUDGMENT

On the memorandum of decision thus made:

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. Excepting the Plaintiff's obligations to Defendant Educational Credit Management Corporation from discharge in BKY 02–50312 would impose an undue hardship on her and her dependent.

2. Excepting the Plaintiff's obligations to Defendant Superior Community Credit Union from discharge in BKY 02–50312 would impose an undue hardship on her and her dependent.

3. Accordingly, the Plaintiff's obligations to the Defendants identified in Terms 1 and 2 were discharged in the due course of BKY 02–50312.

LET JUDGMENT BE ENTERED ACCORDINGLY.