# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3192

_____

In re:  Laura Susan Reynolds,          *
                                       *
          Debtor,                      *
                                       *
Laura Susan Reynolds,                  *
                                       *
          Plaintiff - Appellee,        *
                                       *   Appeals from the United States
          v.                           *   District Court for the
                                       *   District of Minnesota.
Pennsylvania Higher Education          *
Assistance Agency;                     *
                                       *
          Defendant - Appellant,       *
                                       *
The Education Resource Institute;      *
Hemar Insurance Corporation of         *
America;                               *
                                       *
          Defendants,                  *
                                       *
Educational Credit Management          *
Corporation,                           *
                                       *
          Defendant - Appellant.       *

_____

No. 04-3722

_____

In re: Laura Susan Reynolds,                  *
                                              *
          Debtor,                             *
                                              *
Laura Susan Reynolds,                         *
                                              *
          Plaintiff - Appellee,               *
                                              *
     v.                                       *
                                              *   Appeal from the United States
Pennsylvania Higher Education                 *   District Court for the
Assistance Agency; The Education              *   District of Minnesota.
Resource Institute; Hemar Insurance           *
Corporation of America; Educational           *
Credit Management Corporation;                *
                                              *
          Defendants,                         *
                                              *
U. S. Department of Education,                 *
                                              *
          Defendant - Appellant.              *

_____

Submitted: June 24, 2005
Filed:  October 10, 2005
_____

Before RILEY, BRIGHT, and JOHN R. GIBSON, Circuit Judges.
_____

JOHN R. GIBSON, Circuit Judge.

2

The United States Department of Education, Pennsylvania Higher Education Assistance Agency, and Educational Credit Management Corporation appeal from the district court's[1] affirmance of the bankruptcy court's[2] order, which held that Laura Susan Reynolds's student loans were discharged in bankruptcy. The creditors contend that the bankruptcy court erred in discharging the debts on the ground of undue hardship when that court had previously found that Reynolds had the financial resources to pay some portion of the student loans. Reynolds contends that undue hardship is not a strictly pecuniary test and that the bankruptcy court correctly held that the detrimental effect of the loans on Reynolds's precarious mental health warranted discharging the debts. We affirm.

Reynolds began suffering from depressive symptoms as early as middle school and high school, but did not receive treatment or diagnosis at that time. During her junior year at Claremont McKenna College, she suffered a mental health crisis while traveling in Scotland and had to drop out of a study abroad program; on arriving home, she was treated by a psychiatrist for agoraphobia and depression. She received counseling, and, despite a continuing struggle with depression and panic attacks, she was able to make up the missed coursework and to graduate cum laude in 1992. She went on to attend the University of Michigan law school, where her depression worsened, but she nevertheless graduated in 1995, in the middle of her class. She passed the Colorado bar exam and was admitted to practice law in that state.

She undertook an extensive search for a job as a lawyer, participating in on-campus interviews, sending out more than 400 resumes, contacting Michigan alumni, and eventually using a legal employment consultant. Unfortunately, she was never

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

[2]The Honorable Gregory F. Kishel, Chief United States Bankruptcy Judge for the District of Minnesota.

able to find any work as an attorney, other than two hours' work for a friend of her father's. She finally began taking temporary assignments through an employment agency, working as a secretary or administrative assistant. In October 1999, she took a permanent job as an administrative assistant at the St. Paul Foundation, where she worked until the spring of 2001. She left that job, but began another permanent job as secretary-receptionist at a roofing contractor, where she still works, earning about $30,000 per year. She is married, and her husband makes about $29,000 per year driving a school bus.

After leaving school, Reynolds began payments on the loans, but she was only able to make the payments by paying for "everything else" with credit cards. Eventually, she stopped making payments.

Since graduating from law school, Reynolds has seen a number of mental health professionals and has taken a number of medications, such as anti-depressants, mood-stabilizers, and anti-psychotic medications. In August 2001, she was diagnosed with major depressive illness and chronic dysthymic disorder, which is a depression that does not meet the full criteria for major depressive illness. She also suffers from anxiety and panic disorders. In addition to the anxiety, panic attacks and depression, Reynolds has a persistent personality disorder. Her psychiatric expert, Dr. Robert Jones, reported that the "combination of major depression and personality dysfunction often present with the personality disorder being more dysfunctional than would actually be the case if adaptation were not impaired by the affective disorder." Her medications reduce her symptoms, but their effectiveness tends to wane the longer she takes them. Dr. Jones opined that no regimen of medication has been able to bring about a sustained partial remission of her mental illness. Reynolds said that at the time of trial she habitually slept at least ten hours a night during the week and sixteen hours a night on weekends, and she testified that she engaged in self-injury, such as cutting herself. Reynolds suffers side effects from her various medications, including numbness in her extremities, drowsiness, distraction, and itching.

4

Dr. Jones testified that Reynolds's student loans caused her stress, and that stress "can make it more difficult for an individual to respond to treatment for a mood disorder." He stated, "To the extent that she is overwhelmed by indebtedness and can't see the possibilities of her life beyond that indebtedness," the debts made it harder for her to sustain improvement in her depressive illness. Reynolds herself testified that her inability to pay the loans made her feel "like a failure and hopeless and ashamed."

Dr. Jones opined that Reynolds was not able to practice law because she would not be able to provide "interpersonal consultative services" due to personality characteristics and because of the "cognitive deficits associated with intermittent exacerbations of depressive illness." Although Reynolds could be expected to suffer exacerbations of her depression, she ought to be able to function in a job setting similar to that of her most recent administrative-secretarial jobs. But he concluded, "Despite her capacity to return to employment, the inconsistencies in her performance as a result of both depressive illness and characterologic instability, may present challenges to employers who rely on consistency at the level of teamwork and work group membership."

Reynolds owed outstanding student loans to five creditors amounting to more than $142,000 in March 2002. If amortized over ten years, the monthly payments would be $1,641.04, and if amortized over twenty years, $1,021.55. Two of the student-loan creditors, Hemar Insurance Corporation of America and The Educational Resource Institute, did not appeal from the discharge order, so Reynolds is no longer responsible for those debts, which would account for $715.50 of her monthly liability under a ten-year payment plan or $408.06 under a twenty-year plan. The debts to the three remaining creditors are eligible for consolidation under the William D. Ford Direct Loan Program, which would allow Reynolds to pay the loans over a thirty-year period, beginning with an initial monthly payment amount of $502.49.

5

Reynolds's and her husband's combined monthly income was about $3,300, and the bankruptcy court found their household expenses were $2,600, 303 B. R. at 834, although as we will discuss later, both sides dispute those figures.

Reynolds filed a voluntary bankruptcy petition under Chapter 7 on June 20, 2000. She initiated an adversary proceeding for a determination of dischargeability of the student loans under 11 U.S.C. § 523(a)(8)(2000).[3] Under section 523(a)(8)(2000), a discharge in bankruptcy does not discharge a debtor for an educational loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, "unless excepting such debt from discharge . . . will impose an undue hardship on the debtor." The bankruptcy court therefore was required to determine whether exempting the student loans from Reynolds's discharge in bankruptcy would impose an undue hardship on her.

The bankruptcy court applied the "totality of the circumstances" test this court set out for determining undue hardship in In re Long, 322 F.3d 549, 554 (8th Cir. 2003). Reynolds v. Pa. Higher Educ. Assistance Ag'cy, 303 B. R. 823, 836 (Bankr. D. Minn. 2004). Under that test, the court considers (1) the debtor's past, present and future financial resources, (2) the debtor's reasonable and necessary living expenses, and (3) any other relevant circumstances. See Long, 322 F.3d at 554. The bankruptcy court observed that the burden of proving undue hardship lay with Reynolds. Id. at 826.

To determine probable financial resources, the bankruptcy court examined the medical evidence and found that there was no prospect that Reynolds's condition

_____

[3]Section 528(a)(8) was amended by Pub. L. No. 109-8, Title II, § 220, Title XV, § 1501, 119 Stat. 59, 216 (2005) (effective 180 days after April 20, 2005). We need not consider the question of retroactivity, since the amendments are not material to any issue in this case.

6

would improve to such an extent that she could practice law or even work as a paralegal.[4] Id. at 832. The court found that the best Reynolds could do was to remain in the type of job she currently holds, if indeed she is able to perform that job without lapsing into depression or engaging in behavioral incidents connected with her personality disorder, which would be likely to cause her to lose her job or quit. Id. Therefore, the court used Reynolds's current income and expense figures to decide whether Reynolds could pay any or all of the debts without undue hardship. Id. at 834. The court figured that Reynolds and her husband had $700 per month of income in excess of their expenses. Id. The bankruptcy court stated:

> In the last instance, the Debtor did not establish, as a matter of fact, that she lacked all means to pay down all of the component loans in her educational debt structure.
> . . .
> So this proceeding presents a debtor who has some repayment ability in fact, which could be applied to a portion of the referent debt.

Id. at 838.

However, the bankruptcy court found that there was an important countervailing circumstance–that the existence of the debts was injurious to Reynolds's fragile mental health.

---

[4]The bankruptcy court discussed the medical testimony presented by the two sides and found that Reynolds's expert, Dr. Jones, was "by far" more credible than the creditors' expert, Dr. Thomas G. Gratzer. 303 B.R. at 833 n. 7. The court stated that, while Jones's and Gratzer's testimony and diagnoses were similar in many respects, Gratzer's testimony was somewhat beside the point, since Gratzer primarily addressed the question of whether Reynolds could work at all, rather than whether she could work as an attorney. Id. This focus on the wrong issue made Gratzer's testimony "simplistic and inaccurate," whereas the court found Jones's testimony "well-supported[,] . . . spontaneously delivered, and resistant to challenge on cross-examination." Id.

7

Here, the Debtor has been most accurately diagnosed as suffering from "[m]ajor depressive episode, recurrent, severe," "[p]anic disorder with history of agoraphobia," and "[p]ersonality disorder . . . with borderline, histrionic, and narcissistic features, including some evidence of dissociation under stress." She has been professionally recognized as subject to "[p]sychosocial stressors related to problems with," inter alia, "economic problems and problems related to the interaction with the legal system." Her "notabl[e] distress[] with regard to her financial obligations, previous bankruptcy experience, and the continuing struggle to remain solvent in the face of her experience of overwhelming indebtedness" was recognized on evaluation as a major stressor. Her depression, panic attacks, and "brief suicidal thoughts and dissociative episodes" continued during the pendency of this litigation despite the fact that she was taking concerted action to try to cope with this problem.

303 B.R. at 839-40. The bankruptcy court concluded that

It is a matter of inference, but one that has ample support in the record: the extraction of her educational-loan liability from her financial picture would lessen her overall stress level, mitigate her distractability, and significantly reduce the chances of recurring depression and decompensation.[5] . . . On the other hand, there is really no doubt that preserving the Debtor's liability for even a portion of her education loan burden would impose a hardship on her. . . . And, as it must be said, under the totality of her circumstances, the hardship would be "undue."

Id. at 840. The court acknowledged that "subordinating financial circumstances to non-pecuniary ones under [Andrews v. S.D. Student Loan Assistance Corp., 661 F.2d 702 (8th Cir. 1981)] should be reserved only for the extraordinary case, one where the

---

[5]In psychiatry, decompensation means "failure of defense mechanisms resulting in progressive personality disintegration." Dorland's Illustrated Medical Dictionary 432 (28th ed. 1994).

potential of non-pecuniary hardship is manifest, palpable, and of great magnitude. This is one such." Id. at 841. Accordingly, the bankruptcy court held that the debts were discharged. Id.

All five student loan creditors appealed to the district court. The district court affirmed the bankruptcy court's holding that the deleterious effect of the debts on Reynolds's mental health could establish undue hardship notwithstanding her financial ability to pay some portion of the debts. United States Dep't of Educ. v. Reynolds, No. 04-1020 ADM, slip op. at 9 (D. Minn. Aug. 2, 2004). The court further held that the bankruptcy court's findings of fact concerning Reynolds's inability to increase her income and concerning her household income and expenses were not clearly erroneous. Id., slip op. at 10. The district court therefore affirmed the holding of dischargeability.

Three of the five creditors, the United States Department of Education, the Pennsylvania Higher Education Assistance Agency, and the Education Credit Management Corporation, have appealed to this court.

I.

In a bankruptcy appeal, this court sits as a second court of review; we therefore apply the same standards of review to the bankruptcy court's decision as the district court does. In re MBA Poultry, L.L.C., 291 F.3d 528, 533 (8th Cir. 2002). We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Id. The question of whether declining to discharge the debts would pose an undue hardship to Reynolds is a question of law, which we review de novo. In re Long, 322 F.3d 549, 553 (8th Cir. 2003). Subsidiary findings of fact on which the legal conclusion is based are reviewed for clear error. See id. (undue hardship determination "requires a conclusion regarding the legal effect of the Bankruptcy Court's findings as to [the debtor's] circumstances") ; Tenn. Student Assistance Corp.

9

v. Hornsby, 144 F.3d 433, 436 (6th Cir. 1998) (factual findings underlying undue hardship determination will not be set aside unless clearly erroneous).

11 U.S.C. § 523(a)(8) specifies that student loans will not be discharged unless failure to discharge would work an "undue hardship" on the debtor or the debtor's dependents, but the statute does not define the term. In 1981 we interpreted "undue hardship" to require examination of the totality of circumstances, quoting In re Wegfehrt, 10 B.R. 826, 830 (Bankr. N.D. Ohio 1981):

> [E]ach bankruptcy case involving a student loan must be examined on the facts and circumstances surrounding that particular bankruptcy for the Court to make a determination of "undue hardship." The bankruptcy court must determine whether there would be anything left from the debtor's estimated future income to enable the debtor to make some payment on his/her student loan without reducing what the debtor and his/her dependents need to maintain a minimal standard of living.

Andrews v. S.D. Student Loan Assistance Corp., 661 F.2d 702, 704 (8th Cir. 1981). After Andrews was decided, the Second Circuit adopted a different test in Brunner v. N.Y. State Higher Educ. Serv. Corp., 831 F.2d 395, 396 (2d Cir. 1987), a three-step sequential analysis which has attracted a wide following. See Educ. Credit Mgmt. Corp. v. Polleys, 356 F.3d 1302, 1307 (10th Cir. 2004) (collecting cases). However, in Long we rejected the Brunner test and reaffirmed our reliance on the Andrews totality of the circumstances test. 322 F.3d at 554. We explained,

> We prefer a less restrictive approach to the "undue hardship" inquiry. See Andrews, 661 F.2d at 704. We are convinced that requiring our bankruptcy courts to adhere to the strict parameters of a particular test would diminish the inherent discretion contained in § 523(a)(8)(B). Therefore, we continue–as we first did in Andrews–to embrace a totality-of-the-circumstances approach to the "undue hardship" inquiry. We believe that fairness and equity require each undue hardship case to

10

be examined on the unique facts and circumstances that surround the particular bankruptcy.

Id.

We then summarized the totality of circumstances test as applied in this circuit:

> In evaluating the totality-of-the-circumstances, our bankruptcy reviewing courts should consider: (1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and her dependent's reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case. Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt–while still allowing for a minimal standard of living–then the debt should not be discharged. Certainly, this determination will require a special consideration of the debtor's present employment and financial situation–including assets, expenses, and earnings–along with the prospect of future changes–positive or adverse–in the debtor's financial position.

Id. at 554-55 (citations omitted).

The creditors argue that if the debtor has the economic ability to repay the debt, this fact ends the inquiry as to undue hardship, and the bankruptcy court had no further warrant to consider the effect of the continuing student loan liability on Reynolds's health. The creditors base their argument on one passage from Long: "Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt–while still allowing for a minimal standard of living–then the debt should not be discharged." 322 F.3d at 554-55.

We are of the thought that the creditors read this language too narrowly. In Long, we reaffirmed our adherence to the totality of circumstances analysis, and we did so particularly in order to preserve the "inherent discretion" we found in the statutory language and to safeguard the flexibility to be able to respond appropriately

11

to "unique facts and circumstances." Id. at 554. To espouse the creditors' proposed interpretation, we would have to ignore the possibility–and in many cases reality–that a debtor's health and financial position are inextricably intertwined. This reality was discussed at length in Andrews, 661 F.2d at 705, where the court expressly stated that the bankruptcy court had properly considered the debtor's disease as a factor in determination of undue hardship. As recognized in Andrews, illness often affects both a debtor's ability to earn and her expenses; in such cases, factors affecting the debtor's health also have a financial significance. Where the evidence shows that financial obligations are likely to undermine a debtor's health, which in turn will affect the debtor's financial outlook, we think it entirely consistent with Andrews and Long to take such facts and circumstances into account. We will not adopt an interpretation of "undue hardship" that causes the courts to shut their eyes to factors that may lead to disaster, both personal and financial, for a suffering debtor.

Here, in findings that are not clearly erroneous, the bankruptcy court found that the continuing liability from the debts would pose a threat to Reynolds's fragile mental health. 303 B. R. at 840. Although Reynolds may be performing adequately at her current job and may therefore have some disposable income available to dedicate to the debts, the bankruptcy court found that she was at risk for recurrence of symptoms that would cause "voluntary or involuntary termination" of that employment. Id. at 832. The court found "the mere existence of this debt burden clearly is a significant block to the Debtor's recovery from mental illness." Id. at 837. Conversely, eliminating the debt would mitigate her symptoms and reduce the possibility of recurring depression and decompensation. Id. at 840. These conclusions are inferences well-supported by the record evidence of Reynolds's condition.

Another compelling reason for affirming the order of the bankruptcy court is the diagnosis articulated by both the doctors. Dr. Jones stated that Reynolds's diagnostic evaluation included "major depressive episode, recurrent, dysthymia," and

as we have observed before, he stated that there has been no sustained partial remission of her illness. Dr. Gratzer stated that the diagnostic impression, axis I, was "Major depressive disorder, recurrent, in near full remission," and "Dysthymia."

We evaluate Reynolds's condition in light of <u>Long</u>'s requirement that determination of undue hardship requires consideration of "reasonably reliable future financial resources . . . and any other relevant facts and circumstances surrounding each . . . case" and must include "the prospect of future changes–positive or adverse–in debtor's financial position." 322 F.3d at 554-55. We take this together with <u>Andrews</u>' statement, "Serious illness all too often requires extensive treatment and medication. Serious illness may affect an individual's ability to work." 661 F.2d at 705. The diagnosis of the doctors gives further compelling reason to affirm the order of the district court. A condition that is recurrent by its very terms is one that will occur again. <u>See</u> <u>Dorland's Illustrated Medical Dictionary</u> 1434 (28th ed. 1994) (recurrent means "returning after remissions"). A remission is an abatement of the symptoms of a disease. <u>Id.</u> at 1444. Thus, the issue stressed by the bankruptcy court with reference to the stressors affecting Reynolds must also be considered with the recurring nature of her illness and the impact on not only her future health, but her future financial situation.[6]

---

[6]The dissent contends that our analysis grants "double treatment to a debtor's illness" which "borders on illogic circularity," <u>infra</u> at 19-20, by taking into account the effect of the debt on the debtor's health as well as the effect of the debtor's health on her income and expenses. We do indeed take into account two different considerations. First, it is in fact the case that Reynolds's mental health has affected, is affecting, and will affect her earnings. The dissent concedes that we should take this into account. Second, the stress of the debt is likely to affect Reynolds's mental health adversely, causing an even greater decline in her earnings. The dissent contends we must ignore the second factor entirely. The statute provides a remedy for "undue hardship." The dissent contends that we are precluded from considering the effect of the debt on Reynolds's health because "the <u>Andrews</u> court never asked whether the stress from being in debt could affect the debtor's state of health and thus

We therefore see no error in the bankruptcy court's holding that excepting the student loans from the discharge would cause an undue hardship to Reynolds because of the effect of the debts on Reynolds's mental health.

## II.

Two of the creditors, the Pennsylvania Higher Education Assistance Agency and the Educational Credit Management Corporation contend that the bankruptcy court erred in its factual findings concerning the details of Reynolds's household expenses and in determining Reynolds's earning potential. A related issue, not briefed by the parties until after it surfaced at oral argument, was whether the bankruptcy court should have included Reynolds's husband's income as if it were her own, even though the husband is not a debtor in bankruptcy. Because the bankruptcy court's holding was not ultimately based on financial details of whether Reynolds could afford monthly payments, we conclude that the resolution of these arguments would not affect our holding, and we therefore need not reach them.

The Pennsylvania Higher Education Assistance Agency has moved to strike portions of Reynolds's brief and appendix that rely on her deposition testimony. The challenged testimony is substantially reiterated in Reynolds's trial testimony, and so no part of our holding relies on the challenged testimony. We therefore dismiss the motion as moot.

---

was a circumstance contributing to undue hardship." Infra at 19. Andrews did not mention the specific issue, but neither did it say anything that would prevent a court from considering facts before it relevant to the question of undue hardship. Andrews suffered from a form of cancer that was in remission, and there was no evidence such as exists in this case that eliminating the debt would mitigate her symptoms and reduce the possibility of recurrence of the illness. See Reynolds, 303 B.R. at 840.

We affirm the district court's order in turn affirming the judgment of the bankruptcy court.

BRIGHT, Circuit Judge, concurring.

I join in Judge John R. Gibson's opinion affirming the judgment in this case. I add another dimension to the reasons for the determinations of the bankruptcy court and the district court on appeal discharging the student loans for "undue hardship."

The dissent asserts the debtor has sufficient surplus ($700 per month) to pay her student loans ($502.49 per month on an extended thirty-year repayment plan). Infra at 21. That analysis is incorrect based on the record in this case, which is the record before the bankruptcy court and the district court.[7]

The total loans prior to this appeal amounted to $142,044.55 in March 2002. The debtor owed her five student lenders either $1641.05 per month over ten years, $1021.55 per month over twenty years, $1218 per month for the first ten years of a thirty-year plan (two of the lenders do not participate in the Ford loan program, thus not allowing for a thirty-year repayment period), or $910.55 per month for the first twenty years of a thirty-year plan. However the loan obligations are added, the $700

---

[7]The dissent asserts that the student loans require a payment of a little more than half ($502.49) of the amount ($910.55) determined by the district court. This legerdemain is accomplished by considering Reynolds's ability to pay after diminishing her debt to exclude student loans from two lenders who choose not to appeal. The dissent errs in two respects: (1) The record before us is that before the bankruptcy court and the district court. We have no warrant to change that record and become a fact finding court rather than the court of appeals. (2) What warrant is there for giving benefit to the remaining lenders for the decision of two lenders not to appeal? It seems to me their decisions not to appeal recognizes the correctness of the decisions in this case by both the bankruptcy court and the district court.

per month in disposable income that the bankruptcy court allocated to Reynolds and her husband does not sufficiently cover any of these payments.

Moreover, the $700 per month surplus results from combined compensation of both Reynolds and her husband John Turner minus family living expenses. The record shows in a rough way that each contributed about equally to the family income and each incurred about equally to the family living expenses.

The appellants here would apply all of the surplus to the debtor's educational debts. Yet, these debts were incurred prior to Reynolds's marriage. The appellants and the dissent give no consideration to Mr. Turner's interests. Mr. Turner is not a party to these proceedings, and there is no showing that he assumed to pay his wife's loans. Attributing the entire surplus of $700 to the debtor's loans requires Mr. Turner to pay for loans on which he is not obligated.

There is no warrant for such treatment of Mr. Turner. Equitably speaking, Mr. Turner should be entitled to approximately half of the surplus to put to his use to educate his children, to save for the future, or for any other reason. That is, the part of the surplus remaining after contribution to the basic household expenses and attributable to his income. Thus, in fact, under this record only about $350 of the surplus remains in the household budget that could be attributed to the debtor's income.

This analysis is supported by the following cases: In re Innes, 284 B.R. 496, 507-08 (D. Kan. 2002) ("[T]he bankruptcy court correctly considered all of [the non-debtor spouse's] disposable income and applied the proportionate share of her income to the family's essential or basic living expenses. To require her to do more would essentially force her (or her children) to pay debts for which she is not liable and support [the debtor husband] while being denied the right to apply some of her income to reasonable non-luxury items, such as the children's education, and a

modest retirement fund."); <u>In re Berndt</u>, 127 B.R. 222, 225 (Bankr. D.N.D. 1991) (holding, in a Chapter 7 consumer debt case, "[T]he non-debtor spouse's income is not . . . rendered liable for the debts of the Debtor but rather is simply . . . considered in determining whether the Debtor himself has available discretionary income by virtue of the fact that he and the non-debtor spouse share a joint household.").

The strongest case in support of the creditors' view is <u>In re White</u>, 243 B.R. 498, 508-14 (Bankr. N.D. Ala. 1999), where the court combined the non-debtor spouse's and debtor's incomes and then deducted household expenses to determine if a surplus existed. However, <u>White</u> is distinguishable because the debtor in that case attempted to avoid paying student loan debt by contributing toward household expenses far in excess of a minimal standard of living. <u>See id.</u> at 512-14. This case is also distinguishable from the context where a debtor chooses not to work to her earning capacity then seeks to discharge her student loans for lack of income. <u>In re Murphy</u>, 305 B.R. 780, 793-95 (Bankr. E.D. Va. 2004); <u>see In re Oyler</u>, 397 F.3d 382, 386 (6th Cir. 2005) ("Choosing a low-paying job cannot merit undue hardship relief.").

While it is true that the income and expenses of husband and wife are combined for the purpose of examining a household's finances, it does not seem proper, in the circumstances where the debtor and non-debtor spouse have contributed about equally to the family income and expenses, to attribute the entire surplus to the debtor in favor of the debtor's creditors.[8]

---

[8]The dissent mistakenly contends that "[t]his issue was not raised or briefed on appeal." <u>Infra</u> at 20 n.9. This court raised this issue at oral argument after which the parties filed letter briefs. It is not unusual for a court to recognize an issue important to an appeal and not raised by the parties. This court was well within its authority to ask the parties to brief this obvious issue when it was not presented below and the non-debtor husband is not a party to the case.

There is no showing that applying the $350 per month surplus, attributable to the debtor's income, would reduce or retire the loans, considering interest growth on the debt. Additionally, given the nature of the debtor's illness, the "$100 [per month] cushion for various aspects of her medical condition," infra at 20, does not allow her a realistic reserve for possible deterioration of her health condition.

RILEY, Circuit Judge, dissenting.

This court's precedents allow a bankruptcy court, when determining whether declining to discharge a student loan constitutes an undue hardship on the debtor, to examine the totality of circumstances affecting a debtor's reasonable future earning power compared to her living expenses. In re Long, 322 F.3d 549, 554-55 (8th Cir. 2003); In re Andrews, 661 F.2d 702, 704 (8th Cir. 1981). These circumstances may include a debtor's serious illness. Andrews, 661 F.2d at 704-05.

Reynolds's mental illness could be considered such a circumstance in two possible ways. First, her mental illness may make the mere condition of being in debt severely stressful, thus creating an undue hardship. Or, her mental illness could reduce her reasonably reliable future financial resources (by limiting her job prospects both in and out of the legal profession) and potentially increase her expenses (through medical bills and the like), thus creating an undue hardship. See id. at 705. The problem for Reynolds, and the problem with the majority's opinion, is the first method of considering Reynolds's mental illness is not permitted under the Bankruptcy Code and this court's precedent, and the second method is not supported by the record before the bankruptcy court.

The first possible method of considering Reynolds's mental illness as a circumstance affecting her reasonable future earning power compared to her living expenses–that her mental illness makes the mere condition of being in debt severely

18

stressful, thus creating an undue hardship–is unsupported by this circuit's caselaw interpreting the Bankruptcy Code. When this court has considered serious illness as a factor in the determination of undue hardship, we have done so only in terms of how that illness affects a debtor's potential income and expenses; we have never asked whether the condition of having a debt itself constitutes an undue hardship. See id. at 704-05.

The debtor in Andrews suffered from Hodgkin's Disease, a form of lymphatic cancer, although the disease was in remission at the time of her trial. Id. at 703. Having cancer surely is stressful, whether in remission or not. The prospect of a large student loan hanging over one's head only could add to that stress. But the Andrews court never asked whether the stress from being in debt could affect the debtor's state of health and thus was a circumstance contributing to undue hardship. The court discussed the disease only in terms of its effects on the debtor's income and expenses:

> Serious illness all too often requires expensive treatment and medication. Serious illness may affect an individual's ability to work. To some extent, as argued by the creditor, the expenses associated with a serious illness may be covered by health insurance. On remand the bankruptcy court should carefully examine the scope of the debtor's group health insurance coverage. The bankruptcy court should also consider any additional information about the debtor's present employment status and employment prospects.

Id. at 705.

To view a serious illness other than through its effect on income and expenses borders on illogic circularity. The majority opinion makes this very mistake: it concludes having an unpaid debt contributes to Reynolds's mental illness, and mental illness contributes to the inability to repay the debt (which inability, of course,

19

worsens the mental illness, and so on). Such an analysis grants double treatment to a debtor's illness, which is at odds with the "fairness and equity" required by the totality-of-the-circumstances test. Long, 322 F.3d at 554. In asking whether illness itself is an undue hardship, the majority changes this circuit's law–a change I find unwarranted in either law or policy.

Regarding the second possible method of considering Reynolds's mental illness, even assuming the bankruptcy court's findings on Reynolds's income, expenses, and mental illness were substantially supported in the record, those findings do not support a conclusion Reynolds's mental illness makes her reasonable future financial resources insufficient to cover payment of her student loan debt, while still allowing for a minimal standard of living. See id. at 555. The record before the bankruptcy court is clear: while Reynolds's mental illness undoubtedly precludes her ability to enter the legal profession, as either a practicing attorney, paralegal, or legal secretary, Reynolds's psychiatric expert Dr. Robert Jones reported Reynolds can work in a low level clerical or administrative capacity, like the secretary-receptionist position she held at the date of her trial. Relying on this report, the bankruptcy court stated, "As a practical matter, for the indefinite future, she will remain at the level of employment, responsibility, and compensation that she has had since she took her first 'permanent' position with the St. Paul Foundation." In re Reynolds, 303 B.R. 823, 832 (Bankr. D. Minn. 2004).

Reynolds's compensation, when combined with her husband's compensation from his employment, amounts to $3300 per month. Id. at 829. Reynolds's monthly household expenses, even after adding a $100 "cushion" for "[v]arious aspects of [her] medical condition," amount to $2600.[9] Id. at 834. Thus, accounting for the

---

[9]Judge Bright raises an issue in his concurrence regarding the equitableness of including Reynolds's husband's contributions and expenses to these totals. This issue was not raised or briefed on appeal; thus, the majority was correct in not considering it. United States v. Simmons, 964 F.2d 763, 777 (8th Cir. 1992) ("As a general rule,

effects of Reynolds's mental illness on both her income and expenses, Reynolds still has sufficient surplus ($700 per month) to repay her student loans ($502.49 per month on an extended 30-year repayment plan) with an extra safety net of nearly $200 per month with which to maintain or supplement her current standard of living.[10] Id. at 835. Given these facts, our circuit precedent plainly states a student loan debt "should not be discharged." Long, 322 F.3d at 555. The record supports no other conclusion.

One has sympathy for Reynolds, who obviously is very bright, being a Michigan Law School Graduate,[11] but suffers from illnesses preventing her from using that intellect in the legal profession. We are, however, constrained by the Bankruptcy Code as enacted by Congress and by this court's prior cases in determining whether Reynolds's student loans constitute an undue hardship. Therefore, for the reasons stated above, I respectfully dissent.

_____

an appellate court may review only the issues specifically raised and argued in an appellant's brief.")

[10]Judge Bright suggests Reynolds's monthly payment from her total student loan debt is $910.55. This would be correct had all of her creditors appealed from the Bankruptcy Court's discharge order. As the majority opinion correctly notes, however, two of her creditors did not appeal, thus Reynolds is no longer responsible for those debts, which account for $408.06 of Judge Bright's suggested monthly total payment.

[11]Grutter v. Bollinger, 539 U.S. 306, 312 (2003) ("[Michigan] Law School ranks among the Nation's top law schools.").